THE HONORABLE JUDGE ROBERT S. LASNIK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

S.L., by and through his parents and guardians, J.L. and L.L.,

    Plaintiff,

v.

PREMERA BLUE CROSS; AMAZON CORPORATE LLC GROUP HEALTH AND WELFARE PLAN; and AMAZON CORPORATE LLC,

    Defendants.

Case No.: 2:18-cv-01308-RSL

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR: FEBRUARY 10, 2023**

**ORAL ARGUMENT REQUESTED**

## I.    INTRODUCTION

Defendants Premera Blue Cross, Amazon Corporate LLC Group Health and Welfare Plan, and Amazon Corporate LLC (collectively, "Defendants") move for dismissal of S.L., J.L., and L.L.'s (collectively "Plaintiffs") Complaint pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs seek coverage for S.L.'s stay at a facility called Catalyst in Utah when he was a minor under the Employment Retirement Income Security of Act of 1974 ("ERISA") health benefit plan ("the Plan") sponsored by Amazon Corporate LLC Group Health and Welfare Plan and Amazon Corporate LLC.  But the Plan only provides benefits for services that are medically necessary.  Premera found that S.L's stay at Catalyst was not medically necessary after two

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

separate independent child and adolescent psychiatrists reviewed Plaintiffs' claims and concluded that residential treatment was not medically necessary to treat S.L.'s condition.

This Court must review Premera's decision under the abuse of discretion standard, and the Court must uphold Premera's denial of Plaintiffs' claims because there is a reasonable basis to support it. Plaintiffs never presented any medical evidence to contravene the repeated findings by independent reviewers. S.L. never received a psychiatric evaluation establishing that residential treatment was medically necessary, nor any evaluation addressing a timeframe for discharge. The residential treatment center's records do not establish that S.L.'s stay there was medically necessary.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Plan Sponsor, Amazon Corporate LLC, Has Granted Premera Discretion to Decide Claims.

Plaintiff S.L. is a dependent of his father J.L., a participant in the Amazon Corporate LLC Group Health and Welfare Plan (the "Plan"). Dkt. 1 at ¶ 1. The Plan is an employee welfare benefit plan governed by ERISA. Dkt. 1 at ¶¶ 3-4. Amazon Corporate LLC is the "Plan Sponsor" and "Plan Administrator"; as such, it is a fiduciary under ERISA. Dkt. 1 at ¶¶ 3-4. The Summary Plan Description provides that the Plan is self-funded by Amazon ("the Group"), which means that the Group is financially responsible for the payment of plan benefits. Dkt. 1-1 at 3 (Appendix A to Plaintiffs' Complaint, Dkt. 1-1, is the Summary Plan Description).[1]

The Summary Plan Description sets forth the terms of the contract. *Id.* The Group has the final discretionary authority to determine eligibility for benefits and claims and to construe the terms of the Plan. *Id.* However, the Group has delegated discretionary authority to Premera. The Summary Plan Description informs members that Premera is the "Claims Administrator," and that the Group has delegated "the discretionary authority to determine claims for benefits and to construe the terms used in [the Plan]" to Premera. *Id.* This means that the Group has

---

[1] The Summary Plan Description provides Plan members and their providers access to the Medical Policy at www.premera.com/amazon and, in addition, invites members to request copies of it. *Id.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2

KILPATRICK TOWNSEND 76363557 5

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

contracted with Premera to process claims, to exercise its discretion in deciding claims and appeals, and to perform other administrative duties.  Dkt. 1-1 at 3.   Here, the Summary Plan Description is the governing plan document.  Decl. of B. Dychinco.  There is no separate governing plan document.  *Id.*

Here, "Plaintiff does not dispute that the Plan confers discretion on Premera to determine eligibility for benefits and to construe the terms of the Plan."  *S.L. v. Premera Blue Cross*, No. C18-1308-RSL, 2020 WL 4747873, at *2 (W.D. Wash. Aug. 17, 2020).

**B.      Plaintiffs Seek Reimbursement for S.L.'s Stay at Catalyst.**

Prior to attending Catalyst, S.L. was enrolled at a wilderness program called Evoke in Oregon from February 18, 2016 to May 16, 2017.  Dkt. 1 at ¶ 22.  On May 17, 2016, his parents enrolled him at Catalyst in Brigham City, Utah.  Dkt. 1 at ¶ 24.  According to Catalyst, the purpose of its program is to "help[] young men integrate into a healthy lifestyle while developing valuable life skills and hobbies."  Ex. 1, G. Payton Decl.  Catalyst's website describes its program as follows:

> Our program has been designed to create a home-like setting that puts boys at ease as they work through the issues that have often created emotional distress for them and their families.  Returning balance to your family and son through our Core Elements is our goal and forms the bedrock of our program.
>
> We feel it is important to provide students with a balanced life-style.  The right mix of therapy, recreation, art, music, academics, and experiential opportunities create an environment that is truly unique to Catalyst.  Because of Catalyst's intimate setting, we are able to individualize our approach to better fit your son's needs. While this is a difficult time, we are committed to helping your family heal.

Ex. 2 at 3.

**Academics**

**Positive learning environment**

Catalyst Preparatory Academy is fully accredited by the Northwest Accreditation Commission. We offer courses in the core subjects of English, Mathematics, Science, and Social Studies, as well as elective courses in Fine Arts, Physical Education, and Career/Technical Education.  Our program also features a

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

supervised, credit-bearing Advisory course that teaches students organization and goal setting.

Catalyst has a full time Academic Director, Holly Montano. Teachers at Catalyst Prep are subject-matter experts, and each course is taught face-to face with class size ranging from 3-20 students.  While some of our students may not struggle with academics, Catalyst Prep specializes in assisting students who have some ADD/ADHD or processing speed issues.

Teachers rotate through a variety of class activities using multiple learning strategies and continually engage students in discussion.  We offer ACT and SAT prep courses for all of our juniors and seniors.  Our teachers are available for tutoring if students need additional support.

Education is an essential component of Catalyst students' treatment.  The faculty and administration from the school are members of the treatment team and are involved in each student's therapeutic advancement.

Ex. 2 at 37-38.

## C. S.L.'s History.

When S.L. was 15, his parents discovered that, in addition to his ongoing ADHD, depression, and defiance issues, he was ingesting alcohol, Xanax, and marijuana, and surfing the Internet for pornography and escort sites.  R 632.  At that time, S.L. received outpatient care from a counselor named Lisa Chinn at Children's Hospital.  *Id.*  S.L.'s father reports that S.L. stopped attending school and ran away from home several times to look for drugs.  R 633.  S.L.'s father reports that Ms. Chinn and a doctor at Children's Hospital "recommended strongly that [S.L.] go to a locked facility for his safety. Since the State of Washington does not have locked facilities for minors, on January 9, 2016, [S.L.'s parents] admitted [S.L.] to Northwest Behavioral Healthcare Services ('Northwest') outside of Portland, Oregon, an emergency treatment center, admitting him with a dual diagnosis of mental health and drug issues.  He stayed there until February 16, 2016."  R 633.

Premera covered S.L.'s treatment at Northwest.  Dkt. 1 at ¶ 21.  There are no records of any psychiatric evaluation received by S.L. at Northwest.  The only document generated by Northwest is an unsigned statement dated February 7, 2016, near the end of S.L.'s stay at Northwest, from a social worker, Shalaine Linrud.  R 391.  This document states that "[d]espite

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

the past 32 days in treatment, [S.L.] continues to pose significant risk to himself," "[h]e is at extreme high risk for relapse, running away, and self-harm." *Id.* It further states the "opinion that due to [S.L.'s] behavior and state of mind he is unable to be safely managed within a home setting," "that at this time [S.L.] would [not] be capable of successfully returning to a regular school setting," and that [S.L] need[s] long-term therapeutic care in a highly structured setting . . . for the duration of at least a year." *Id.* Immediately after leaving Northwest, S.L. enrolled at Evoke, a wilderness program.[2] Dkt. 1 at ¶ 22. He remained at Evoke from February 18, 2016 to May 16, 2016, when he was immediately transferred to Catalyst. R 414; R 1835.

No physician recommended that S.L. enroll at Catalyst. Plaintiffs provided no medical records regarding his condition or treatments before enrolling at Catalyst, except for the unsigned statement from the social worker at Northwest, and some notes from Evoke, the wilderness program, from February 18, 2016 to May 16, 2017. *See* R 391; 1835.

Lisa Dickman, a social worker at Catalyst, prepared a document titled "Master Treatment Plan" dated May 19, 2016, two days after S.L. enrolled at Catalyst on May 17. R 414. Regarding S.L.'s referral to Catalyst, she wrote:

> [S.L.] completed treatment at Evoke Wilderness and it was recommended that he go onto an RTC program in order to continue working on his substance abuse issues, dishonesty, depression, anxiety, anger issues, inability to manage his moods and to have help in navigating his academic struggles. [S.L.] also needs help creating boundaries and keeping himself safe.

R 414. Ms. Dickman noted the following:

> Upon arrival [S.L.] was visibly anxious/nervous. He was resistant to expectations such as taking a drug test and continued peer support based off of them not fitting a certain profile. After being at Catalyst for 2 hours [S.L.] announced that he had pocketed his prescribed Tazadone (400 mg) from the night before and took it. Due to this, an evaluation was not able to be completed until today. He reports

---

[2] According to Evoke's website, "Evoke's Wilderness Therapy works with the outdoors, reaching deep and accomplishing growth that just can't be achieved in a therapist's office or hospital setting." Ex. 3 at 3. According to Evoke's website, "Evoke Therapy Programs offers [sic] hope in the wilderness for teens ages 13–17, young adults ages 18–28+, and families struggling with difficulties like trauma, depression, anxiety, low self-esteem, defiance, and substance abuse." Ex. 3 at 9.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 5

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

taking the medication as a way to escape his emotions in the moment.  [S.L.] was placed on watch for the next 24 hours.

R 414.

The Master Treatment Plan states that S.L. would receive the following:  "Family Therapy (Telephonic) 1 times per week"; "Group Therapy 3-4 time(s) per week"; "Individual Therapy 1 time(s) per week."  R 416-23.

On May 27, 2016, ten days after S.L. enrolled at Catalyst, he received an evaluation from J. Blake Petrick, a psychiatric nurse practitioner.[3]   R 335-39.  This was the first and only psychiatric evaluation of S.L. in the record.  Mr. Petrick concluded that S.L. had ADHD and anxiety, ruled out all other potential problems, and determined that S.L.'s "safety risk" was low:

Clinical Picture: He denies any depressive symptoms now, though he has suffered some in the past.  He states that ADHD is untreated at this time, and he is hoping to get that treated while he is here at Catalyst.  He also complains of anxiety, but this is secondary to a primary problem of ADHD, from his report.

Severity:  He reports a moderate amount of anxiety.  Depression is now in remission.  ADHD is severe.

Timing: ADHD as long as he can remembers at least the age of five years old, Depression symptoms were off and on during the last seven months of the substance use.

Duration: Depression was a few hours, a few days a week, and random and sporadic.  Anxiety was present most of the time, at least to a mild extent.  ADHD was all the time in all settings.

R 335.

Psychiatric Evaluation

Context: Depression/anxiety were present prior to substance abuse, however they were mild, and Exasperated [sic] by the substance use, from his own admission.

Associated S/S: Anxiety he describes as worrying about school, worried about the safety of family he cannot control this anxiety.  There is also a modest amount of social anxiety, Depression, sadness and lack of interest and low self worth, is now remitting, ADHD, he describes as inability to focus, organize, follow step by step

---

[3] Several documents in the record generated by Premera inaccurately identify Mr. Petrick as a medical doctor.  Mr. Petrick signed his report as a nurse practitioner.  R 339.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 6

KILPATRICK TOWNSEND 76363557 5

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

instructions, getting bored easily distracting others, not being able to listen for long periods of time. He believes without stimulant medication, which he has been prescribed and used in the past, it takes him at least three times longer to finish any task, whether it be schoolwork, chores at home, or anything in which he engages.

Suicide Attempts- None.

R 336.

Psychiatric Review of Symptoms:

* Mood: He says depression is now remitting. He thought the Prozac has been helpful.
* Psychosis: Unremarkable/none.
* Anxiety: Present, generalized, and social anxiety.
* Obsessions & Compulsions: Denied/Unremarkable.
* Trauma & Abuse: Denied/Unremarkable.
* Disassociation: Denied/Unremarkable.
* Somatic: Denied/Unremarkable.
* Attention/ Concentration: Poor; related to inattentive symptoms of ADHD. There has also been a measure of impulsivity. Hyperactivity has resolved as he has gotten older, from his report. Though the impulsivity continues to be a problem. He continues to interrupt others, does things without thinking. This has been reported by him, and staff here at Catalyst.
* Sleeping: He reports well, especially here at Catalyst, and did well in Wilderness.

R 337.

Mental Status Exam: [S.L.] is oriented times four [person, place, time and event] and cognitively intact. He interrupts often, is distracted, fidgety, constantly moves on the chair in which he is sitting, goes to a two seat sofa, where he lays out. Makes no eye contact. Thoughts derail and go from subject to subject in a tangential way. Presents without question, in an inattentive state, likely from attention deficit hyperactivity disorder. Dressed and groomed appropriately. There is no evidence of psychosis or internal stimuli in any way. Mood comes across as euthymic and affect congruent without significant anxiety upon observation.

R 338.

[M]y own assessment, the ADHD, attention deficit hyperactivity disorder, is met in all areas, specifically attention and impulsivity. He is hyperactive as far as being fidgety, from his own report he is not running around as he used to, but he cannot sit still and constantly wants to move.

R 338.

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

1

2

3

> Safety/Risk assessment: Low in my professional judgment, as [S.L.] has been assessed, and I have consulted with staff here at Catalyst, and thus far his behavior has been safe and compliant.  He has made no gestures of self harm, or comments of suicidal ideation, and no attempt to run from the program.

4

R 339.

5

> Medication Plan/ Recommendations: I will continue Prozac, 40 mg, in the morning and Trazodone, 400 mg, at night for now.

6

R 339.

7

> S.L. had two additional interactions with Mr. Petrick but there were no other psychiatric or psychological examinations at Catalyst.  Ms. Dickman saw S.L. on July 11, 2016 after he had been at Catalyst for almost two months (since May 17, 2016) because of an event described as follows in the record:

8

9

10

11

> [S.L.] has reported that he felt suicidal on 7/9/16 and because of this tried to kill himself in the bathroom.  [S.L.] was never in the bathroom more than a couple of minutes and staff were suspicious of his behaviors prior to going to the bathroom so were actively monitoring.  [S.L.] did not have any marks on his neck or any other marks that would confirm his reported attempts of strangling himself with his guitar strap.

12

13

14

15

R 425.   On July 12, 2016, Mr. Petrick wrote the following about this event:

16

17

18

> Over the weekend it was reported [S.L.] claimed to have attempted to choke himself with a guitar strap after an argument with a mentor.  As we discussed, he stated this was not a suicide attempt, "but is [sic] I hurt myself enough that mentor would be in trouble and I wanted to get back at him."

19

20

21

> I see vindictive behavior, no sign of anxiety or depression and effect or speech. He has responded to an increase of methylphenidate is SR.  Noticeable improvement, but he still manifests tangential, distracted impulsive thought process.

22

R 710.

23

24

25

Ms. Dickman repeatedly and without exception reported in Daily Progress notes, "Self-Harm/Suicide Risk: None."  *See* R 2288-2322, R 2374-88, 2399-2404, 2569-83, 2594-99, 2939-53, 2964-69.

26

The last time that Mr. Petrick examined S.L. was on July 29, 2016:

27

[S.L.] reports remorse over his impulsive behavior and choice to run from Catalyst

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 8

KILPATRICK TOWNSEND 76363557 5

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

2 days ago.  He was found at Walmart, and had stolen two bottles of cough syrup. He states feeling remorse, fearing he causing [sic] parents more problems. Currently on 'watch,' until further notice, or one to one with a mentor.

R 1731.

The daily progress notes show that while at Catalyst, S.L. participated in the planned activities:  Family Therapy (Telephonic) 1 times per week; Group Therapy 3-4 time(s) per week; Individual Therapy 1 time(s) per week.  R 416-23.

**D.     The Plan Only Covers Medically Necessary Services.**

Premera provides coverage for a wide range of medically necessary behavioral health treatments for members such as A.C. who need care, including residential treatment, partial hospitalization, intensive outpatient, and outpatient counseling.  Dkt. 1-1 at 23-24.

The Summary Plan Description defines "medically necessary" as follows:

**Medically Necessary**

Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

- In accordance with generally accepted standards of medical practice;

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and

- Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

Dkt. 1-1 at 76.

The Summary Plan Description also states that "Premera Blue Cross has developed or adopted guidelines and medical policies that outline clinical criteria used to make medical necessity determinations."  Dkt. 1-1 at 46.    Premera utilized a Medical Policy licensed from

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

InterQual, which develops evidence-based care guidelines for use by healthcare and government organizations.  R 2700-18; R 2719-24.

The Medical Policy sets forth symptoms that, if they exist—and if they persist—would make residential treatment medically necessary for the patient.  At least one of the following symptoms must be present within the last week:

- Disruptive behavior, defined as one of the following:
    - Physical altercation/angry outbursts
    - Destruction of Property
    - Easily frustrated *and* impulsive
    - Sexually inappropriate/aggressive/abusive
    - Runaway from facility/home pass
    - Persistent rule violations;
- Psychomotor agitation/retardation;
- Depersonalization/Derealization;
- Hypervigilance/paranoia;
- Psychiatric medication refractory/resistant *and* symptoms of one of the following increasing and persisting:
    - Anxiety *and* associated symptoms
    - Depressed/irritable mood *and* associated symptoms
    - Hypomanic symptoms
    - Obsessions/compulsions
    - Psychosis and associated symptoms; and
- Nonsuicidal self-injury; or
- Suicidal/homicidal ideation without intent.

R 2704.  In addition, the patient must exhibit one of the following symptoms:

- Unable/unwilling to follow instructions/negotiate needs;
- Interpersonal conflict as characterized by one of the following affects:

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

- o   Accusatory/threatening/manipulative;

- o   Hostile/intimidating;

- o   Poor/intrusive boundaries; or

- o   Unable to establish positive peer/adult relationships;

- Repeated privilege restriction/loss of privileges.

R 2704.  Further, the patient must be receiving all of the following services while in residential treatment:

- Psychiatric evaluation at least 1 time per week;

- Clinical assessment at least 1 time per day;

- Individual/family psychoeducation;

- Individual/group/family therapy at least 3 times per week;

- Implementation of a behavioral contract/symptom management plan; and

- School or vocational program.

R 2704.

**E.     Plaintiffs' Claims for Residential Treatment Were Reviewed and Denied by Premera and Two Independent Reviewers.**

S.L.'s parents decided to enroll S.L. at Catalyst.  Dkt. 1 at ¶ 24.  On May 13, 2016, Catalyst submitted a request to Premera for preauthorization of coverage in advance of S.L.'s anticipated admission to Catalyst.  R 2042; Dkt. 1 at ¶ 25.  The request included 3-month old records from S.L.'s admission to Evoke, but did not contain any medical records related to S.L.'s admission to Catalyst.   Dkt. 1 at ¶ 26; R 1858.

On May 16, 2016, Premera's Medical Director Paul Molchan, MD, who also holds a Master's in Public Health, denied the request because the only records were from Evoke, and this information was "from 3 months ago and farther back" and, therefore, there was no basis for concluding that residential treatment was medically necessary. Dkt. 1 at ¶ 26; R 1858.  Therefore, Premera advised that "[i]f you have this service, you will be responsible for the full cost."  R 1858.  Premera advised Plaintiffs that "[y]ou have the right to appeal any action we take or

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

decision we make about your coverage or services.  You also have the right to file a complaint if you are dissatisfied with the quality of care or services you have received from either us or a provider." R 1859.  Premera explained in detail the appeal process.  *Id.*

Plaintiffs then submitted additional medical records and contacted Lindsay Bland, the Plan's service representative, who arranged a call between Premera's Medical Director, Robert Small, M.D., who is board certified in Child and Adolescent Psychiatry, and Lisa Dickman at Catalyst, and they discussed the reasons for S.L.'s admission.  R 2048.  Dr. Small made a contemporaneous note regarding the call, stating as follows:

> I explained that I had reviewed the documentation she had submitted from the current RTC stay and that there was no documentation of symptoms or symptom severity meeting our medical necessity criteria for RTC [residential treatment center].  She did not disagree, noting that member was there to work on various issues, not because of any current symptom severity.

> Therefore, the denial is upheld.  I explained appeal rights. R. Small, M.D.

R 2048.

On September 16, 2016, S.L.'s parents initiated a Level I appeal of the decision.  R 375-85.  Premera sent Plaintiffs' Level I appeal to an independent review organization independent of Premera.  A physician board certified in child and adolescent psychiatry reviewed Plaintiffs' appeal submission and records, including the Psychiatric Evaluation, Master Treatment Plan, treatment notes and logs from both Evoke and Catalyst, the Plan language, and Premera's Medical Policy—the InterQual 2015 Residential and Community-Based Treatment Criteria.  R 624-28.  The independent physician included a "Conflict of Interest Statement" certifying his independence and an absence of any conflict of interest on his part.  *See* R 627-28.

The independent physician concluded as follows: "The service provided (Ongoing Residential Treatment 5/17/16-ongoing) is not medically necessary based on the provided medical policy and plan language."  R 625.  The independent physician found that "[a]s of 5/17/16 the patient did not meet any of the symptom severity criteria that would require the use of residential treatment center level of care."  *Id.*  The independent physician also noted that "[i]n

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

order to meet criteria for medical necessity," at least one of the symptoms identified in the InterQual Criteria, set forth above, had to be present. *Id*. He found that "[o]n 5/17/16 none of these areas of concern were present." R 626.

Consequently, on September 26, 2016, Premera sent Plaintiffs a letter informing them that that "there was no medical necessity for the admission and ongoing stay in a residential treatment setting starting May 17, 2016. Therefore, the denial is upheld as not medically necessary." R 1185-87. Therefore, "[i]t was determined the denial for the Mental Health Residential Treatment is accurate. This decision was made based on the plan language and InterQual® Criteria." *Id.*

In its letter, Premera stated that "[S.L.] is currently a 16 year old male who has a long history of treatment for difficulties with attention deficit hyperactivity disorder, anxiety, depressive symptoms, substance use, and conduct-related problems. He was admitted to a residential facility on that May 17, 2016, having just spent 3 months in a different wilderness residential program (date of service February 18, 2016 through May 16, 2016). By May 17, 2016, [S.L.]'s presentation was such that there was no longer any need for the use of residential treatment. He no longer has symptoms that required treatment in a residential setting." R 1185. Premera noted that "[S.L.] would have benefited from continued treatment, but there was not a necessity that appropriate treatment take place in a residential setting." *Id.* Premera further advised Plaintiffs that "[i]f you are not satisfied with the outcome, you may request a second review of this appeal." R 1186. Premera described the appeal process and how to file an appeal. R 1186-87.

On November 16, 2016, S.L.'s parents initiated a Level II appeal of Premera's denial of benefits. R 939-45. Premera had a full panel review S.L.'s claim. R 1189-91. The panel consisted of a physician Medical Director board-certified in family medicine, a National Accounts Customer Service Manager, and an Operations Manager, all of whom had experience in reviewing health plan appeals. R 1189. The panel reviewed all material submitted with Plaintiffs' Level I and Level II appeals, the findings of the independent physician reviewer, the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

Premera Medical Policy, S.L.'s medical records, and the Plan language.  *Id.*

On December 20, 2016, the panel affirmed the prior decision that Catalyst was not medically necessary because "criteria were not met for severe functional impairment" and, therefore, "coverage at Catalyst Residential Treatment Center remains denied as not medically necessary." *Id.*  "This decision is based on the plan language, which excludes coverage on any service or supply determined to be not medically necessary." *Id.*  Premera advised Plaintiffs that "[i]f you still feel that we have administered [S.L.]'s benefit plan incorrectly, you may choose to have Premera submit the case to an Independent Review Organization (IRO) for a coverage decision that will be binding on us."  R 1190.

On July 7, 2017, Plaintiffs requested an IRO review of Premera's decision.  R 296.  Washington and federal law mandates independent reviews (if requested by the member).  They are conducted by an IRO—a firm of medical specialists qualified to review member appeals and certified by the Washington Department of Health.  R 1191; RCW 48.43.537; RCW 48.43.535.  IROs are randomly selected online using the Washington Office of the Insurance Commissioner's rotational registry system and the outcome of the independent review is binding on the insurer.  WAC 284-43A-150; RCW 48.43.535(8) ("Carriers must timely implement the certified independent review organization's determination . . .").  As Premera advised Plaintiffs, the IRO decision is binding on Premera.  R 1190.

Using this system, the Insurance Commissioner selected the Center for Health Dispute Resolution/MAXIMUS, Inc. as the reviewer for Plaintiffs' claim.  R 1566.  "The MAXIMUS Physician Reviewer" who analyzed Plaintiffs' appeal "is board certified in psychiatry with sub-specialty certification in child and adolescent psychiatry and is actively practicing."  R 1553.

On July 19, 2017, the independent psychiatrist selected by the Insurance Commissioner upheld Premera's decision.  R 1551-57.  The psychiatrist "determined the services at issue were not and are not medically necessary for treatment of the member's medical condition.  Therefore, MAXIMUS has decided Premera Blue Cross's denial of the services at issue should be Upheld."

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

R 1551.  The IRO reviewed the entire record including additional information provided by Catalyst since the Level II appeal.  *See* R 1553.  MAXIMUS concluded that, based on the record, "[t]he Health Plan has denied reimbursement and prospective authorization and coverage for residential treatment center services from 5/17/16 forward.  Per the Health Plan, the services at issue were not and are not medically necessary for the treatment of this patient."  R 1555.

The psychiatrist used "an evidence-based instrument," "the Child and Adolescent Level of Care Utilization System (CALOCUS)," and noted that such a tool "is indispensable in determining necessary level of care for children."  R 1556.  The psychiatrist applied CALOCUS to assess risk of harm, functional status, comorbidity (co-occurring serious medical problems), recovery environment level of stress, level of support of the recovery environment, resiliency and treatment history, acceptance and engagement of the patient, and acceptance and engagement of the parents.  R 1556.  Scoring each of these categories, the IRO came up with a composite score of 17 to 18, which on the CALOCUS scale correlates with "intensive outpatient services," not residential treatment.  *Id*.  Accordingly, the IRO concluded that "from 5/17/16 forward, . . . [t]he Health Plan's determination that the services at issue were not and are not medically necessary for the patient was not unreasonable or inconsistent with sound, evidence-based medical practice pursuant to RCW 48.43.535."  R 1557.

After the IRO's decision, the Plaintiffs filed this lawsuit.

### III.    ARGUMENT

**A.    The Court Should Review Premera's Decision Under the Abuse of Discretion Standard of Review.**

It is undisputed that the Plan documents establish the abuse of discretion standard of review.  Plaintiffs have asserted that the Court should grant less deference to Premera because of procedural irregularities, but discovery did not reveal any evidence of procedural irregularities.

**1.    This Court has Held that the Plan Documents Establish the Abuse of Discretion Standard.**

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 15

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

Where, as here, the Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the abuse of discretion standard applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989) (citing 29 U.S.C. § 1132(a)(1)(B)). This Court has found that "Plaintiff does not dispute that the Plan confers discretion on Premera to determine eligibility for benefits and to construe the terms of the Plan, and that accordingly, the standard for this Court's review is abuse of discretion." *S.L. v. Premera Blue Cross*, No. C18-1308-RSL, 2020 WL 4747873, at *2 (W.D. Wash. Aug. 17, 2020) (citing *Firestone*, 489 U.S. at 115; Dkt. 28 at 13; Dkt. 1-1 at 3). Moreover, this Court has held that in this case "the Plan confers discretion on Premera to determine eligibility for benefits and to construe the terms of the Plan," and therefore "the standard for this Court's review is abuse of discretion." *S.L. v. Premera Blue Cross*, No. C18-1308-RSL, 2022 WL 3586998, at *1 (W.D. Wash. Aug. 22, 2022) (citing *Firestone*, 489 U.S. at 115).

Here, the Summary Plan Description clearly and unambiguously grants discretionary authority to Premera, as the Plan Administrator, to interpret the Plan's terms and determine benefits eligibility. The Summary Plan Description identifies Premera as the "Claims Administrator," to whom the Plan has delegated "the discretionary authority to determine claims for benefits and to construe the terms used in [the Plan]." Dkt. 1-1 at 3.

Here, the Summary Plan Description is the governing plan document. Decl. of B. Dychinco. Because the Summary Plan Description and the governing plan document are "one and the same," the Summary Plan Description may delegate discretionary authority to Premera, and the abuse of discretion standard applies here. *Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1170 (9th Cir. 2015) (citing *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011) (the Summary Plan Description and the Plan may be one and the same.)). Thus, the abuse of discretion standard of review applies, and the Court must uphold the denial of coverage if it is grounded "on *any* reasonable basis." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (emphasis original).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 16

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713   FAX: (206) 260-8946

**2.  There is No Evidence of Procedural Irregularity Supporting Reduced Deference to Premera's Decision.**

Plaintiffs have sought leave to obtain and obtained discovery, even though they agree that the abuse of discretion applies, because they allege procedural irregularities.  *See S.L.*, 2022 WL 3586998, at *1.  Discovery is not usually allowed for ERISA benefit claims where the abuse of discretion standard applies.  *Id.*  But discovery has not revealed any evidence of procedural irregularity.  Plaintiffs' claims for residential treatment were reviewed and denied by Premera and two independent reviewers who specialized in child and adolescent psychiatry, including an IRO selected by the state of Washington.  The IRO's decision was binding on Premera.  *See infra* at R 1190.

Regardless, "procedural violations of ERISA do not alter the standard of review from abuse of discretion review to de novo review unless the violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006).  Here there is no flagrant procedural violation by Premera.  Still, where a procedural irregularity is not flagrant, "[a] procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."  *Id.* at 972.  But there is no procedural irregularity that would require the Court to give any less weight to Premera's decision.[4]

**B.    Premera's Denial of Plaintiffs' Claim is Supported by Reasonable Bases.**

The Court should uphold Premera's denial of the claimed benefits under abuse of discretion review because there are reasonable bases to support it.  Premera's denial was upheld in the Level I and Level II appeals—both of which relied on an independent physician's opinion and Premera's Medical Policy—and then upheld again by an IRO decision conducted

---

[4] A structural conflict of interest, which arises when the administrator acts as both the plan administrator and the funding source for benefits, may also affect the standard of review.  *Abatie*, 458 F.3d at 965.  However, here it is undisputed that there is no structural conflict of interest because Premera does not fund the Plan.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 17

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

independently by the Washington State Insurance Commissioner.  Catalyst did not provide services that met the InterQual Criteria, and S.L.'s condition and symptomology did not satisfy them.

### 1.      Premera's Determination that S.L.'s Stay at Catalyst Was Not Medically Necessary was Reasonable.

#### a.      No psychiatrist examined S.L. to determine whether residential treatment was medically necessary.

S.L.'s stay at Catalyst is not medically necessary under the InterQual criteria.  "The InterQual Criteria are nationally recognized, third-party guidelines designed to 'help healthcare organizations assess the safest and most clinically appropriate care level for more than 95% of reasons for admission.'"  *Julie L. v. Excellus Health Plan, Inc.*, 447 F.Supp.3d 38, 43, n.3 (W.D.N.Y. 2020) (quoting    *Change Healthcare, InterQual Level of Care Criteria*, https://www.changehealthcare.com/solutions/interqual/level-of-care-criteria).[5]

Plaintiffs cannot establish that S.L.'s stay at Catalyst was medically necessary.  First, while S.L. received a single psychiatric evaluation at Catalyst, it did not establish that his stay at Catalyst was medically necessary.  The one psychiatric evaluation that S.L. did receive established that he suffered from ADHD and anxiety.  These conditions did not require residential treatment, as the independent psychiatrists who reviewed the claim found.  Second, S.L. did not receive any continuing evaluation to determine a timeframe for his discharge or whether his continued stay at Catalyst was medically necessary.

---

[5] "[T]hese types of guidelines have been found to be appropriately relied on by plan administrators."  *Julie L.*, 447 F.Supp.3d at 43, n.3 (citing *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, 877 F.3d 687, 690 (6th Cir. 2017) ("To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines.  Both were developed by independent companies with no financial interest in admitting more inpatients than outpatients.  The InterQual Criteria were written by a panel of 1,100 doctors and reference 16,000 medical sources."); *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc*., 852 F.3d 105, 114 (1st Cir. 2017) ("BCBS reviewers reasonably consult the InterQual Criteria, which are nationally recognized, third-party guidelines.  The criteria provide a sensible structure for analyzing a patient's particular symptoms, diagnoses, risks, and circumstances to determine what level of medical care is medically necessary.").

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

The InterQual Criteria state explicitly that residential treatment is medically necessary only when the patient is receiving all of the following services:

- Psychiatric evaluation, initial within 1 business day, subsequent at least 1 time per week;
- Clinical assessment at least 1 time per day;
- Individual/family psychoeducation;
- Individual/group/family therapy at least 3 times per week;
- Implementation of a behavioral contract/symptom management plan; and
- Preliminary discharge plan initiated with 24 hours.

R 2704.   None of this happened.

Some of the daily progress notes contain observations of S.L. during activities, and his medications.  These all show that S.L. had no significant psychiatric problems requiring 24/7 residential confinement.  *See N.F. v. Premera Blue Cross*, No. C20-0956-JCC, 2021 WL 4804594, at *4 (W.D. Wash. Oct. 14, 2021) (holding that residential treatment was not medically necessary because the beneficiary's symptoms and lack of psychiatric care did not meet the medical policy requirements for medical necessity); *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, No. C17-1041JLR, 2021 WL 2911121, at *18 (W.D. Wash. July 12, 2021) (holding that residential treatment was not medically necessary because the beneficiary's symptoms and lack of psychiatric care did not meet the InterQual criteria for medical necessity); *Peter B. v. Premera Blue Cross*, No. C16-1904-JCC, 2017 WL 4843550, at *5 (W.D. Wash. Oct. 26, 2017) (upholding "Premera's coverage determinations" because they "were consistent with Plan requirements," and "Premera relied on the advice of an independent physician in making its final coverage decision").

        **b.**       **Premera correctly concluded that S.L. could have been treated with a lower level of care, such as outpatient treatment while living in his community.**

The SPD provides that medically necessary services are:

• Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and

• Not primarily for the convenience of the patient, physician, or other health care

provider, **and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease**.

Dkt 1-1 at 76 (emphasis added).  The Summary Plan Description also requires that "[i]npatient facility services must be furnished and billed by a hospital or by a rehabilitation facility that meets our clinical standards, and will only be covered when services can't be done in a less intensive setting."  Dkt 1-1 at 24.  The InterQual Criteria likewise require the least intensive service required to meet the patient's needs:

> Residential treatment center criteria is used for a patient who has been admitted or is expected to be admitted to a psychiatric residential treatment center.  There is lack of evidence to support the effectiveness of this level of treatment over less restrictive levels of care for individuals with a viable living environment, **therefore it is only recommended in cases where an individual cannot be managed safely in the community yet doesn't require the services of an inpatient hospitalization.**

R 3334 (emphasis added); *see also Julie L.*, 447 F. Supp. 3d at 55 (holding that the InterQual criteria "are consistent with the Plan's basic requirement that inpatient services are covered only where treatment in a less intensive setting would not be effective").

Catalyst provided only a minimal level of mental health treatment, and that demonstrates that S.L. could have been treated with a less intensive level of care than residential treatment.  The evaluation that S.L. did receive identified his symptoms as ADHD and anxiety.  He was not a danger to himself or others; he was not depressed.  The question is not whether S.L.'s stay at Catalyst was beneficial to him.  The question is whether it was covered under contract.  "The Court's inquiry requires focusing not on whether [S.L.] took advantage of and/or benefited from the structure and support offered in residential treatment, but, rather, whether such level of care was medically necessary."  *Doe v. Harvard Pilgrim Health Care, Inc.*, No. 15-10672, 2019 WL 3573523, *10 (D. Mass. Aug. 6, 2019).

Premera does provide coverage for a wide range of behavioral health treatments for members like S.L. who need care.  *See* Dkt. 1-1 at 23-24.   In this case, a less intensive level of treatment in his own community was medically necessary, and Premera would have provided

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 20

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

coverage for this treatment.  Premera's approach of covering the least intensive, effective level of care has been repeatedly upheld by courts.  *Eugene S.*, 663 F.3d at 1133 (affirming plan denial of residential treatment center care because patient met criteria for continued treatment at "a less restrictive level of care" to include "several hour[s] [per] day, multiple times [per] week [of] psychiatric evaluation and treatment including counseling, education and therapeutic interventions."); *Jon N. v. Blue Cross Blue Shield of Mass.*, 684 F. Supp. 2d 190, 201-202 (D. Mass. 2010) (affirming plan denial of residential treatment center care where plan policy was to consider "psychiatric subacute care, partial hospitalization, and intensive outpatient care" and then to authorize coverage for the "least restrictive clinically appropriate setting" when "the physician reviewers determined that Patricia's case required intensive outpatient treatment, but nothing more.").

> **2.**     **The Binding IRO Decision Validates Premera's Denial of Coverage.**

Where, as here, a benefits determination is upheld by an independent review organization, the denial rests on a reasonable basis.  *See Peter B.*, 2017 WL 4843550, at *5 ("The Court finds as follows: Premera's coverage determinations were consistent with Plan requirements, Premera relied on the advice of an independent physician in making its final coverage decision, there is no evidence of shifting rationales, and the IRO review validated Premera's final benefit determination."); *Tracy O. v. Anthem Blue Cross Life & Health Ins. Co.*, No. 2:16-CV-422-DB, 2017 WL 3437672, at *9 (D. Utah Aug. 10, 2017)  (noting, in granting summary judgment in favor of the defendants, that the insurer's "conclusions are further supported by the independent review" of the claims); *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 Fed. Appx. 568, 576 (10th Cir. 2017) (noting in a disability benefit case that a decision to terminate long-term disability benefits was supported by two independent reviewers who concluded that the claimant was able to work); *see also Basquez v. East Cent. OK Elec. Co-op., Inc.*, No. 06-CV-487 (SPS), 2008 WL 906166, at *11 (E.D. Okla. March 31, 2008) (citing *Davis v. UNUM Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006)) ("[A]n administrator's decision to seek [] independent expert advice is evidence of a thorough investigation. When an administrator . . . opts to

investigate a claim by obtaining an expert medical opinion—independent of its own lay opinion and that of the claimant's doctors—the administrator is going to pay a doctor one way or another. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict." (internal citations and quotations omitted)); *see also* John Bronsteen, Brendan S. Maher & Peter K. Stris, *ERISA, Agency Costs, and the Future of Health Care in the United States*, 76 FORDHAM L. REV. 2324-26 (2008) (explaining that external review significantly diminishes agency risk because the agent's discretion for opportunistic behavior is circumscribed by the determinations of an impartial reviewer).

> **3.** **The Recommendations of S.L.'s Treating Clinicians Do Not Overcome the Reasonable Basis for Premera's Denial of Benefits.**

In the course of reviewing a request for coverage, Premera considers the entire record submitted including letters from treating providers.  Premera must consider all of the facts, but a treating provider's recommendation, while informative, cannot be dispositive.  Courts have held that general assessments and recommendations that do not correlate to the medical policy embodying the appropriate standard of care and should not be credited above the decision of the IRO and the assessments of the other independent reviewers.  *See*, *e.g.*, *Garrett v. Prudential Ins. Co. of Am*., 107 F. Supp. 3d 1255, 1265–66 (M.D. Fla. 2015) ("Nor was it wrong to give little or no weight to the treating physicians' letters, since they were conclusory and do not take into consideration the Plan's definition of disability as it relates to Plaintiff's ability to perform the material and substantial duties of her regular occupation.") (citing *Harvey v. Standard Ins. Co*., 503 Fed. Appx. 845, 849 (11th Cir. 2013) ("Each of Standard's record reviewers acknowledged that Harvey had degenerative disc disease, but concluded that Harvey could perform sedentary work level activities with a sit/stand work accommodation.  On the other hand, Harvey's physician diagnosed her with lumbar disc degeneration and scoliosis, but never provided information regarding her level of functional impairment or the amount of work activity in which she could engage.")).

In the course of their appeals process, Plaintiffs submitted the following letters of support

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 22

KILPATRICK TOWNSEND 76363557 5

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

from S.L.'s therapists:

- Letter from Lisa Ann Dickman, LCSW at Catalyst, dated October 25, 2015,[6] R 2267-68;
- Letter from Shalaine Linrud, MSW at Northwest Behavioral Healthcare Services, dated February 7, 2016, R 2339;
- Letter from J. Huffine, Ph.D. at Evoke, dated May 17, 2016, R 392-96; and
- Letter from Adam Poll, MS, LMFT at Catalyst, dated July 5, 2017, R 297-99.

Ms. Linrud recommended that S.L. receive "long-term therapeutic care in a highly structured setting . . . for the duration of at least a year." R 2339. Ms. Dickman, Dr. Huffine, and Mr. Poll specifically recommended a residential treatment center level of care for S.L.

These letters do not overcome Premera's reasonable decision, even though they identified problems that they observed S.L. experienced and were from therapists who worked with S.L. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823, (2003). Rather, as courts have now repeatedly recognized, it makes more sense to "consider 'the length and nature of [the treating physician and plaintiff's] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence.'" *Barbu v. Life Ins. Co. of North America*, 35 F. Supp. 3d 274, 289 (E.D.N.Y. 2014) (quoting *Connors v. Conn. Gen. Life. Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (brackets added by *Barbu*) & citing *Black & Decker*, 538 U.S. at 832). The Court's task on review of the administrator's decision is to "'evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative.'" *Reetz v. Hartford Life & Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1083 (W.D. Wash. 2018) (quoting *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006)).

In contrast to the reviewers in this case, none of the providers who generated opinions upon which Plaintiffs rely are psychiatrists. Only Dr. Huffine at Evoke wilderness program is a psychologist. Ms. Dickman, S.L.'s therapist at Catalyst, described S.L.'s difficulty at Catalyst following rules and controlling his emotions. R 2267. But she does not apply any criteria to assess the medical necessity of residential treatment. She does not address whether S.L.'s

---

[6] Ms. Dickman's letter is dated October 25, 2015, which is well before S.L. was admitted to Catalyst on May 17, 2016. Given the timeline for the appeal and the underlying events in the case, Premera assumes that Ms. Dickman's letter is from October 2016 rather than 2015.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 23

KILPATRICK TOWNSEND 76363557 5

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713 FAX: (206) 260-8946

impulsive behavior could be addressed in a less intensive setting.

Dr. Huffine described S.L. as "highly impulsive" as a result of his ADHD and as struggling in social settings as a result of anxiety.  R 394.  He does not apply any criteria or explain why ADHD cannot be addressed in a less intensive setting such as outpatient care.   And like Ms. Dickman, Dr. Huffine does not correlate these symptoms to the Medical Policy criteria for medical necessity.  Dr. Huffine simply concludes, without reference to the criteria or to any standard of care for adolescent psychiatry, that S.L. "must be in a residential or therapeutic boarding school setting . . . so that he can practice and internalize the tools he learned at Evoke." R 396.

Plaintiffs have not submitted any medical evidence that would undermine the reasonableness of the denial at issue in this case.

## C.   Under the De Novo Standard of Review, Premera Is Still Entitled to Summary Judgment.

The Court should grant summary judgment to Premera even if the de novo standard of review were to apply.  When review is de novo, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt. Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010).  Nevertheless, a plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to benefits by a preponderance of the evidence.  *Muniz*, 623 F.3d at 1294 ("As concluded by other circuit courts which have addressed the question, when the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant"); s*ee also*, *Schwartz v. Metro. Life Ins. Co.*, 463 F. Supp. 2d 971, 982 (D. Ariz. 2006) ("Plaintiff has the burden of proof to show that he was eligible for continued long term disability benefits based on the terms and conditions of the ERISA plan"); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("The Court concludes that Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan"); *Jordan v. Northrop Grumman*

*Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1155 (C.D. Cal. 1999) ("[T]he burden in making such a claim [for entitlement to benefits] is on Plaintiff"); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) ("A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits"); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) ("[W]e agree that it was [the claimant's] burden to show that he was entitled to the 'benefits . . . under the terms of his plan,'" quoting 29 U.S.C. § 1132(a)(1)(B) (omission original)).

Though Premera contends that the abuse of discretion standard of review applies, the Court should grant summary judgment under either that or the de novo standard.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendants.

DATED this 13th day of January, 2023.

KILPATRICK TOWNSEND & STOCKTON LLP

By   */s/ Gwendolyn C. Payton*
     Gwendolyn C. Payton, WSBA No. 26752
     gpayton@kilpatricktownsend.com
     Telephone: (206) 626-7713
     Facsimile: (206) 260-8946

*Counsel for Defendants Premera Blue Cross;
Amazon Corporate LLC Group Health and
Welfare Plan; and Amazon Corporate LLC*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 25

KILPATRICK TOWNSEND 76363557 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WASHINGTON 98101
(206) 626-7713  FAX: (206) 260-8946

1

### CERTIFICATE OF SERVICE

2     I HEREBY CERTIFY that on the 13th day of January, 2023, I electronically filed the

3 foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the

4 Court using the CM/ECF system which sent notification of such filing to the following:

5     **Megan E Glor**

6     MEGAN E. GLOR, ATTORNEYS AT
    LAW

7     707 NE KNOTT STREET, STE 101
    PORTLAND, OR 97212

8     503-223-7400
    Fax: 503-751-2071

9     Email: megan@meganglor.com

10     **Eleanor Hamburger**
    **Richard E Spoonemore**

11     SIRIANNI YOUTZ SPOONEMORE
    HAMBURGER

12     3101 WESTERN AVENUE STE 350
    SEATTLE, WA 98121

13     206-223-0303
    Fax: 206-223-0246

14     Email: ehamburger@sylaw.com
    Email: rspoonemore@sylaw.com

15

16     DATED this 13th day of January, 2023.

17                           **Kilpatrick Townsend & Stockton LLP**

18                           By: *s/ Gwendolyn C. Payton*

19                               Gwendolyn C. Payton, WSBA #26752
                              *Attorneys for Defendants Premera Blue Cross,*

20                               *Amazon Corporate LLC Group Health and*

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE - 1

KILPATRICK TOWNSEND 76363557 5