1

2                                                    THE HONORABLE ROBERT S. LASNIK

3

4

5

6                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
7                                      AT SEATTLE

8
   S.L., by and through his parents and
9  guardians, J.L. and L.L.,
                                                    Case No. 2:18-cv-01308-RSL
10                     Plaintiff,
                                                    PLAINTIFF'S RESPONSE TO
11         v.                                       DEFENDANTS' MOTION FOR
                                                    SUMMARY JUDGMENT
12 PREMERA BLUE CROSS, AMAZON                       Noting Date: March 3, 2023
   CORPORATE LLC GROUP HEALTH
13 AND WELFARE PLAN, and AMAZON
   CORPORATE LLC,
14
15                     Defendants.

16

17

18

19

20

21

22

23

24

25

26

# Table of Contents

Table of Contents ......................................................................................................... i

Table of Authorities .................................................................................................... iii

I.    Introduction ..................................................................................................... 1

II.   Argument ......................................................................................................... 2

    A.  Premera's Conflict of Interest Influenced its Denial Decision ................................ 2

    B.  Premera Abused its Discretion by Denying S.L.'s Coverage Claim ....................... 4

       1.   Premera abused its discretion by applying the InterQual
          Criteria without performing a federally-mandated
          mental health parity assessment ..................................................................... 4

       2.   Premera abused its discretion by applying the
          InterQual Criteria to determine medical necessity ...................................... 6

       3.   Arbitrary Claim Denial:  Premera abused its discretion
          by denying plaintiff's claim after giving Catalyst only
          ninety minutes to produce records ................................................................ 8

       4.   Arbitrary Appeal I Denial:  Premera arbitrarily denied
          S.L.'s Level I Appeal based upon assessment of S.L.'s
          condition on a single day ............................................................................ 10

       5.   Arbitrary Appeal II Denial:  Premera arbitrarily failed to
          engage a mental health expert, denying plaintiff a full
          and fair review under ERISA ...................................................................... 11

       6.   Premera abused its discretion by ignoring ERISA's
          "full and fair review" regulation in both of its
          appeal reviews ........................................................................................... 12

       7.   Premera arbitrarily ignored that S.L.'s continuing severe
          mental health problems had failed outpatient treatment
          and ignored his treating providers' opinions in both
          appeal reviews ........................................................................................... 13

           a.   Outpatient treatment had not been effective for S.L. .................... 13

      b.  S.L. was admitted to Catalyst for treatment of mental health and substance use disorders that had resulted in life-threating behaviors ............................................15

      c.  S.L. exhibited destructive behaviors and remained at great risk of relapse through the close of the record .................18

      d.  S.L.'s providers showed that Catalyst's residential treatment was medically necessary .................................................19

III.     Conclusion ........................................................................................................24

**Table of Authorities**

**United States Supreme Court Cases**

*Metro. Life Ins. Co. v. Glenn*, 554 U.S. (2008)...................................................................2


**United States Court of Appeals Cases**

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (en banc)............................13

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997)........................................9

*Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211 (9th Cir. 2007) ................................20

*Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*,
852 F.3d 105 (1st Cir. 2017).............................................................................................5


**United States District Court Cases**

*Alexandra H. v. Oxford Health Ins., Inc.*
2013 U.S. Dist. LEXIS 110482 (S.D. Fla. Aug. 6, 2013)........................................................22

*Julie L. v. Excellus Health Plan, Inc.*,
447 F.Supp.3d 38 (W.D.N.Y. 2020) ...................................................................................5

*K.F. v. Regence BlueShield*,
2008 U.S. Dist. LEXIS 69150 (W.D. Wash. Sep. 10, 2008) ...................................................22

*Leu v. Cox Long-Term Disability Plan*,
2009 U.S. Dist. LEXIS 124836 (D. Ariz. July 24, 2009) ..........................................................3

*Mason v. Fed. Express Corp.*,
165 F. Supp. 3d 832 (D. Alaska 2016) ..........................................................................3, 13

*Yox v. Providence Health Plan*, 2013 U.S. Dist. LEXIS (D. Or. Dec. 31, 2013),
affirmed, *Yox v. Providence Health Plan*, 659 Fed. Appx. 941 (9th Cir. 2016)........................22


**Other Authorities**

29 U.S.C. § 1104 (a)(1).....................................................................................................9

29 CFR § 2560.503-1.........................................................................................1, 2, 11, 12, 13

iii

# I.   INTRODUCTION

The Court already found that "'evidence of irregularities in the claims handling procedure that resulted in the [denial] of benefits'" when granting S.L.'s motions to compel discovery. Dkt. #47, at p. 4 (quoting *Vancleave v. Boeing Co. Non-Union Long Term Disability Plan,* No. C09-1512RSL, 2010 WL 8946093, at *2 (W.D. Wash. June 15, 2010)); Dkt. #67.  The additional court-ordered discovery revealed that Premera ignored federal mental health parity requirements in adopting the InterQual Criteria for residential mental health treatment, the criteria it applied to S.L.'s claim.  *See* Dkt. #77, at pp. 11-12.

Plaintiff's Motion for Summary Judgment shows that defendants' conflicts of interest went much further, influencing their decision-making at all levels of claim and appeal review:

1.   **Failure to Comply With the Federal Mental Health Parity Act:**  When Premera adopted the InterQual Criteria in April 2016, it ignored federal mental health parity requirements:  Premera failed to perform the federally-mandated comparative analysis of non-quantitative treatment limitations ("NQTLs") between medical/surgical benefits and mental health/substance use disorder benefits before adopting the Criteria for its behavioral health program – which it applied to S.L.'s claim.  *See Id.*, pp. 11-13.

2.   **Arbitrary Claim Denial:**  Premera denied coverage of S.L.'s claim solely on the basis that it had been provided outdated medical records, but had given the provider, Catalyst, only 90 minutes to produce records – of a ***different*** provider.  Premera also arbitrarily applied the InterQual Criteria (which it had adopted without performing an NQTL analysis), which imposed more stringent conditions than the Plan's terms.  *See Id.*, at pp. 13-17.

3.   **Arbitrary Level I Appeal Review:**  Premera denied S.L.'s Level I appeal based upon its consultant's assessment of S.L.'s condition on a single day, May 17, 2016, the day S.L. was admitted to Catalyst.  This was in violation of the Plan's terms, and was even in violation of the InterQual Criteria.  *See Id.*, at pp. 18-19.

4.   **Level II Appeal Review That Violated ERISA Regulation**:  Premera failed to engage a mental health expert to review S.L.'s Level II appeal, denying plaintiff a "full and fair" review under ERISA.  29 CFR § 2560.503-1(h)(3)(iii).  Instead Premera relied upon a panel that included a member who was generally disinclined to approve residential mental health treatment.  *See Id.*, at pp. 19-22.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 1 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

5. **Premera Arbitrarily Ignored Treating Providers' Opinions at Each Level of Review**:  Premera ignored the opinions of S.L.'s treating providers at three facilities, who concluded that S.L. required residential treatment and would be endangered by treatment at a lower level of care.  Premera relied instead upon file review consultants who disregarded the treating providers' opinions and mechanically applied the InterQual Criteria, which imposed more stringent conditions than the Plan's terms.  *See Id.*, at pp. 22-23.

6. **Premera Violated ERISA's "Full and Fair" Review Regulations,** 29 CFR § 2560.503-1, in denying both of S.L.'s appeals.  Premera (a) failed to identify any specific plan language as the basis for its denials of S.L.'s Level I appeal, and (b) failed to engage a mental health expert in its review of S.L.'s Level II appeal.  *See Id.*, at pp. 19 n 4, 20-21.

Defendants wholly fail to address these issues in their Motion (Dkt. #75).

Defendants' conflict of interest tainted Premera's claim review at each level of review, resulting in an arbitrary denial decision, such that the Court should overturn Premera's denial denial, applying heightened scrutiny pursuant to *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

## II.    ARGUMENT

### A.  Premera's Conflict of Interest Influenced its Denial Decision.

Defendants erroneously state that "there is no structural conflict of interest because Premera does not fund the Plan" and misstate the nature of the Court's review in asserting that "...the Court must uphold the denial of coverage if it is grounded 'on *any* reasonable basis.'" Dkt. #75, at p. 17, n 4 (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006) (en banc)), p. 16 (quoting *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (emphasis in original)).

While "[s]tructural conflicts can be neutralized by delegating claims administration responsibilities to third parties," the "**delegation of claims administration does not negate a**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

**structural conflict outright**." *Leu v. Cox Long-Term Disability Plan*, No. 2:08-CV-00889-PHX-JAT, 2009 U.S. Dist. LEXIS 124836, at *6-7 (D. Ariz. July 24, 2009) (emphasis added).  In *Mason v. Fed. Express Corp.*, 165 F. Supp. 3d 832, 850 (D. Alaska 2016), the court stated that while Aetna, the plan's "Claims Paying Administrator," did not operate under a structural conflict of interest "because the Plan is self-funded and maintained by FedEx," "that is not the end of the story."  The Court observed that "FedEx pays benefits claims out of its own undedicated funds" and "therefore has an obvious incentive to hire a Claims Paying Administrator that minimizes benefits awards," and stated, "According to the Supreme Court in *Glenn*, [554 U.S. at 114], an employer's own conflict may 'extend to its selection of an insurance company to administer its plan.'" *Id*. at 850.  "In fact," the Court explained, "'[a] so-called independent administrator may have much more of an incentive to decide against claimants' than either an employer or 'an insurance company spending 'its own money''' in that it "'may have an incentive to 'show how tough [it is] on claims to better market [its] services to self-insured employers,' whereas insurance companies 'may have an incentive to be more liberal than appropriate because its experience-based premiums amount to a cost-plus contract, such that the more it spends, the more it makes.'" *Id*. (quoting *Abatie, supra*, 458 F.3d at 977 (Kleinfeld, J., concurring)).

As one of the largest health insurers in the state of Washington, Premera has a financial disincentive to provide coverage for costly adolescent mental health treatment — for which demand has rapidly increased in recent years.  *See* https://www.seattletimes.com/seattle-news/mental- health/teens- carry-a-threat-to-mental-health-in-their-pockets/ ("In Washington, between 2015 and 2021, the number of hospitalizations nearly doubled among youth whose primary diagnosis is psychiatric, The Seattle Times found." (accessed 2/19/23)).  As the paid third-party

administrator for the health plan of Amazon, one of the largest corporations in the world,

Premera has additional financial incentive to deny claims (i.e., "to 'show how tough [it is] on

claims'" (p. 3, *supra*)), including S.L.'s claim for residential mental health treatment.  Contrary

to defendants' assertions, there is a conflict of interest and the denial decision should be

scrutinized closely given the evidence that Premera's conflict influenced its decision-making

from start to finish.

**B.  Premera Abused its Discretion by Denying S.L.'s Coverage Claim.**

**1.  Premera abused its discretion by applying the InterQual Criteria without performing a federally-mandated mental health parity assessment.**

Defendants acknowledge that Premera "utilized a Medical Policy licensed from

InterQual..." in its review of S.L.'s claim.  Dkt. #75 at pp. 9-10.  They assert that "[t]he InterQual

Criteria are nationally recognized, third-party guidelines designed to 'help healthcare

organizations assess the safest and most clinically appropriate care level for more than 95% of

reasons for admission.'"  *Id*., at p. 18 (quoting *Julie L. v. Excellus Health Plan, Inc*., 447

F.Supp.3d 38, 43, n.3 (W.D.N.Y. 2020)).  However, they do not address whether Premera

complied with Federal Mental Health Parity requirements in adopting and applying the Criteria,

even though Plaintiff's Motion to Compel a Rule 30(b)(6) deposition, and the deposition itself,

focused on this issue.  *See* Dkt. #51-7, at p. 2 (designating as deposition topic "All aspects of

Premera's Mental Health Parity [NQTL] MHPAEA analysis in 2016…"); Dkt. #78-1 (Premera

witness' testimony).

There are four main problems with Defendants' arguments that Premera could choose

with impunity to apply the Interqual Criteria to determine "medical necessity" of residential

mental health treatment, including for S.L:

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 4 of 24

1. Premera did not adopt the InterQual Criteria for a clinical reason. It adopted the Criteria to "increase efficiency" and "streamline" its appeals process, i.e, to save money. *See* Dkt. #77, at pp. 11-12.

2. Premera did not conduct the federally-mandated NQTL analysis before adopting the InterQual Criteria for residential mental health treatment and applying them to Plaintiff's coverage claim. *See id.*, at pp. 11-13.

3. The InterQual Criteria for residential mental health treatment are not consistent with Parity requirements or the standard of care, according to the only evidence before the Court. *See id.*, at pp. 12-13.

4. After improperly adopting the InterQual Criteria, Premera did not apply them correctly: Premera evaluated S.L.'s presentation on a single day, rather than using the InterQual Criteria's look-back period. *See id.,* at pp. 13, 18-19.

Defendants do not address any of these errors in their motion. Nor did the courts address these issues in the cases defendants cite to support their argument that Premera reasonably applied the InterQual Criteria in denying S.L.'s claim. *See Julie L, supra.* 447 F.Supp.3d at 47-49, 52-58 (W.D.N.Y. 2020) (plaintiff's arguments regarding application of InterQual Criteria and FMHPA); *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.,* 852 F.3d 105, 114-117 (1st Cir. 2017) (plaintiff's arguments regarding application of InterQual Criteria). Neither decision addressed: (1) whether the administrator adopted the InterQual Criteria in order to save money, (2) whether the administrator conducted a federally-mandated NQTL analysis before adopting the InterQual Criteria for behavioral health, (3) whether the InterQual Criteria for mental health are consistent with Parity requirements, or (4) whether the administrator correctly applied the InterQual Criteria's look-back period in administering the claim. According to the decisions, the parties in those cases did not raise these issues. In contrast, S.L. has shown that Premera arbitrarily adopted and applied the InterQual Criteria, which was an abuse of its discretion.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 5 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

**2. Premera abused its discretion by applying the InterQual Criteria to determine medical necessity.**

Premera not only also abused its discretion by failing to comply with Mental Health Parity requirements in adopting the InterQual Criteria but also when it arbitrarily applied the InterQual Criteria to S.L.'s claim, ignoring the fact that the Criteria imposed additional conditions that were more restrictive than the terms of the Plan:

- **Premera arbitrarily imposed an onerous *acuity* requirement through its application of the InterQual Criteria**. *See* Dkt. #77, at p. 16.  S.L. had long-standing, severe mental illness and substance use disorders that had resulted in increasingly dangerous behaviors despite outpatient treatment, hospitalization and short-term residential treatment.  *See id.,* at pp. 2-6 and pp. 13-17, *infra*.  Providers from three treating facilities (Northwest Behavioral Healthcare Services ("NBHS"), Evoke and Catalyst) confirmed that S.L. required residential "mental health **services to manage [and] lessen** the effects of [his] psychiatric condition[s]" (AR 836, emphasis added) and that the services were clinically appropriate.  Plaintiff's expert, child psychiatrist Dr. Louis Kraus, also explained:

  > Clinically, it is quite evident when adolescents are in need of residential placement for mental health reasons: they typically, but by no means always, have had a number of inpatient psychiatric hospitalizations, IOP, or PHP programs and Wilderness programming, to which they have not responded well. They may also have had unsuccessful community interventions, including outpatient treatment and possible therapeutic school interventions as well. Families often use extraordinary resources to help their child and the child is still struggling.  Dkt. #29-4, at p. 15.

  By applying the InterQual acuity criteria to S.L.'s claim, Premera imposed upon S.L. an arbitrary hurdle to coverage, which denied S.L. access to medically-necessary treatment.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 6 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

- **Premera arbitrarily failed to account for S.L.'s co-morbidities in applying the InterQual Criteria.** *See* Dkt. #77, at p. 16. The comorbidities included ADHD, depression, anxiety and alcohol and substance abuse. "Each adds a risk factor to his care," yet the constellation of these conditions "was not considered with regard to S.L.'s increased risk of relapse or deterioration if he was prematurely discharged." Dkt. #29-4, at p. 20 (Dr. Kraus); *See* AR 624-629 (Dr. Holmes' review of Level I Appeal, with no analysis of S.L.'s treatment needs given his comorbidities), AR 2169-2172 (Level II Appeal panel's review, with no analysis of S.L.'s comorbidities).

- **In applying the InterQual Criteria, Premera arbitrarily failed to address the potential risks to S.L. from a return home**. In mechanically applying the InterQual Criteria, Premera did not consider S.L.'s unique circumstances, including whether discharge to home was likely to result in further deterioration, or any other aspect of S.L.'s family, academic or social conditions or level of available support. *See* Dkt. #77, at p. 16; *See also*, Dkt. #29-4, at pp. 20, 21, 22, 24 (Dr. Kraus).

- **Premera did not address the long-standing, chronic nature of S.L.'s mental health and substance use disorders and escalating dangerous behaviors in applying the InterQual Criteria**. In applying the InterQual Criteria, Premera limited its consideration of S.L.'s condition to his acute symptomatology occurring within the prior 72 hours. *See* Dkt. #77, at p. 16. Dr. Kraus explained:

> One can imagine that if S.L.'s symptoms were worse or present within the 72 hours of admission, he would have needed inpatient hospitalization, not residential treatment. Under the InterQual criteria, as applied by Premera, it could be almost impossible for anyone to safely meet the criteria for residential treatment. The InterQual criteria that Premera Blue Cross applied to S.L. is faulty and appears designed to deny most residential treatment to those adolescents in need. The criteria appear designed to

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 7 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

provide coverage only in the narrowest of situations – when an adolescent is quite ill to the point of needing hospitalization, but where the condition rebounds in a very short period of time.  Dkt. #29-4, at p. 21.

Premera narrowed the timeframe for analysis even further by limiting its review to the single day of S.L.'s admission to Catalyst.  *See* Dkt. #77, at pp. 18-19.

• In mechanically applying the InterQual Criteria, Premera failed to reasonably take into account the judgment of S.L.'s mental health providers, who had observed S.L. over many weeks (NBHS) or months (Evoke, Catalyst).  Premera's disregard of the unanimous conclusions of the treating providers that residential treatment was medically necessary was arbitrary.  This error was particularly egregious because Premera's decision involved a judgment regarding mental health.  *See Id*., at pp. 22-23 (citing cases).  Dr. Kraus explained:

> As indicated in the [American Medical Association]'s 2011 position on medical necessity… the independent judgment of treatment providers, informed by direct patient contact, clinical experience and intuition is paramount to safe and optimal effective behavioral health care.  The Premera medical necessity criteria through IntraQual minimize this.  The criterion focuses on a lack of acuity, as is the rational[e] for admission.  In many cases, residential treatment patients are no longer in an acute crisis but are still not ready for discharge."  Dkt. #29-4, at p. 22.

Defendants fail to address these issues.  *See* Dkt. #75, at pp. 18-19.

**3.  Arbitrary Claim Denial:  Premera Abused its Discretion By Denying Plaintiff's Claim After Giving Catalyst Only Ninety Minutes to Produce Records.**

Defendants argue that Premera's Dr. Molchan denied S.L.'s coverage request – submitted by Catalyst – "because the only records were from Evoke, and this information was 'from 3 months ago and farther back' and, therefore, there was no basis for concluding that residential treatment was medically necessary."  *Id*., at p. 11 (quoting AR 1858).  They omit and fail to

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 8 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

address that Premera was responsible for the absence of necessary records and failed to cure its

missteps.

After allowing three days to pass before reviewing Catalyst's pre-authorization request,

Premera gave Catalyst only 90 minutes to produce Evoke's treatment records – the day before

S.L.'s admission to Catalyst.  *See* Dkt. #77, at pp. 13-14.  When Catalyst did not meet Premera's

90-minute deadline, inexplicably, Premera failed to contact Evoke or S.L.'s parents to request the

records it needed, in disregard of its fiduciary duty under ERISA.  *See* 29 U.S.C. § 1104 (a)(1)

(an ERISA plan "fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries and…(B) with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims").

Admonishing an ERISA administrator for its failure to communicate with the claimant

regarding material information it needed to make an accurate claim decision, the Ninth Circuit

explained in *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) that "if

the plan administrators believe that more information is needed to make a reasoned decision,

they must ask for it," adding, "There is nothing extraordinary about this; it's how civilized people

communicate with each other regarding important matters." *Id.*  In disregard of its fiduciary duty

under ERISA, Premera arbitrarily denied S.L. costly mental health treatment based upon lack of

documentation – a problem Premera substantially created.

Defendants also erroneously imply that Dr. Molchan reviewed S.L.'s claim for medical

necessity.  Dkt. #75, at p. 11 ("...therefore, there was no basis for concluding that residential

treatment was medically necessary." (citing AR 1858 (Premera's denial letter)).  He did not.  The

sole basis for his opinion, and Premera's denial decision, was that the available treatment records

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 9 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

were outdated.  Premera's failure to obtain the necessary records denied S.L. a review of the merits of his coverage claim and resulted in an arbitrary claim denial.

### 4.   Arbitrary Appeal I Denial:  Premera arbitrarily denied S.L.'s Level I Appeal based upon assessment of S.L.'s condition on a single day.

Premera arbitrarily denied S.L.'s Level I appeal by basing denial upon its consultant's assessment of S.L.'s condition on a single day, May 17, 2016, the day S.L. was transferred from a prior treatment program to Catalyst, in violation of the terms of the Plan and the InterQual Criteria.  *See* Dkt. #77, at pp. 18-19.  Defendants admit that Premera's consultant, Dr. Holmes, "found that '[a]s of 5/17/16 the patient did not meet any of the symptom severity criteria that would require the use of residential treatment center level of care.' AR 625."  Dkt. #75, at p. 12.  However, they do not address the fact that Premera's single-day review was in violation of the terms of the Plan and the InterQual Criteria.  Nor do they discuss S.L.'s treatment record in addressing Premera's Level I Appeal review.  *See* Dkt. #75, at pp. 12-13.

By the time Premera engaged Dr. Holmes in late September 2016, Catalyst's records confirmed that the recommendation that Dr. Huffine (Evoke) had made in May 2016, upon S.L.'s discharge – that S.L. receive continuing mental health treatment in a residential facility – was entirely appropriate:  S.L. had continued to experience severe mental health symptoms during the four and a half months he had been at Catalyst and had exhibited aggression, drug-seeking behavior, suicidality, running away, stealing, lying and manipulation throughout his stay.  *See* Dkt. #77, at pp. 5-6; Dkt. #29-4 at pp. 22-23 (Dr. Kraus' analysis of Catalyst's records).  Dr. Holmes did not analyze Catalyst's treatment record (see AR 624-628) and Premera does not discuss it in its motion.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 10 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Dr. Holmes not only ignored the treatment record but also failed to correctly apply the InterQual Criteria, which include look-back periods for functionality. *See* Dkt. #77, at p. 18; AR 899.

Defendants' assertion of Dr. Holmes' conclusion, without discussion of the medical record through the time of his review, is misleading. His opinion, which ignored the medical record, the terms of the Plan and the Criteria's look-back period, was arbitrary.

### 5. Arbitrary Appeal II Denial:  Premera arbitrarily failed to engage a mental health expert, denying plaintiff a full and fair review under ERISA.

Defendants vaguely assert that "Premera had a full panel review S.L.'s claim" in its Level II appeal review. Dkt. #75, at p. 13. Premera's Level II review panel did not include a mental health specialist, in violation of ERISA's full and fair review regulation, which denied S.L. "a reasonable opportunity for a full and fair review of [its] claim and adverse benefit determination." 29 CFR § 2560.503-1 (h)(3); *See* (h)(3)(iii) (ERISA appeal reviewers must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.").

The Level II appeal review was the final step in Premera's claim and appeal review process. The Level II appeal was particularly important in S.L.'s case because Premera had (1) denied S.L.'s claim based upon the unreasonable assertion of outdated records and had not performed any substantive medical review; and (2) denied the Level I appeal based upon Dr. Holmes' arbitrary review of S.L.'s condition on a single day and erroneous application of the InterQual Criteria. *See also*, Dkt. #77, at pp. 13-14 (addressing claim denial), pp. 18-19 (addressing Dr. Holmes' single day review), pp. 14-17 (addressing erroneous application of InterQual Criteria).

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 11 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Therefore, the Level II appeal review was S.L.'s final (and only) potential opportunity to receive a full and fair review of his claim – one that reasonably considered his mental health and substance use history, increasing and life-threatening behaviors, complete treatment record (*see id.*, at pp. 2-7) and the opinions of the providers at three mental health facilities that Catalyst's residential treatment was medically necessary.  *See id.*, at p. 22.

Once again, Premera did not provide a full and fair review.  Premera did not include a required mental health expert on its panel.  Compounding its error, Premera included a panelist who "expressed a strong disinclination for residential treatment centers, despite clear Plan language describing medically necessary coverage of residential mental health treatment."  Dkt. #47, at p. 4 (citing [AR 562, AR 2169] (panelist, asserting that an RTC is "...basically a boarding school with some therapy sprinkled on top."), [AR 36]); *See* Dkt. #77, pp. 20-21.  Further, there is no evidence that Premera's Level II Appeal panel applied the Plan's medical necessity terms – or even the InterQual Criteria.  *See id.*, at pp. 19-22.

Therefore, while Premera might have assigned what ***Premera*** deems a "full panel" for its Level II appeal review, the panel's composition did not comply with ERISA's "full and fair" review regulation and its decision – the final decision of the Plan – was arbitrary.

### 6.  Premera abused its discretion by ignoring ERISA's "full and fair review" regulation in both of its appeal reviews.

Premera makes the general assertion that "discovery has not revealed any evidence of procedural irregularity" but does not discuss the requirements of a full and fair review under ERISA.  Dkt. #75, at p. 17.  Premera violated the ERISA "full and fair review" regulation, 29 CFR § 2560.503-1, at both levels of appeal review.  At Level I, Premera failed to identify any specific plan language as the basis for its denial, in violation of 29 CFR § 2560.503-1(j)(ii) and

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 12 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

at Level II Premera failed to include a qualified expert on its review panel, in violation of 29

CFR § 2560.503-1(h)(3)(ii).  *See also* Dkt. #77, pp. 19-22.

"A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding

whether an administrator's decision was an abuse of discretion."  *Abatie, supra,* 458 F.3d at 972;

*see Mason*, *supra*, 165 F. Supp. 3d at 851-852 (quoting *Abatie*).  Premera's failure to comply

with the full and fair review regulations compounded its many other errors and is further

evidence that its denial decision was arbitrary.

**7.   Premera arbitrarily ignored that S.L.'s continuing severe mental health problems had failed outpatient treatment and ignored his treating providers' opinions in both appeal reviews.**

Defendants extract bits of "S.L.'s History" beginning in the fall of 2015, shortly before

his admission to NBHS (Dkt. #75, at p. 4), but do not discuss his long mental health history or

the persistence of his symptoms and functional problems at home and school despite years of

outpatient treatment beginning in childhood.  By the time S.L. was admitted to Catalyst in May

2016, he had been in psychotherapy with numerous practitioners, received psychiatric treatment

and attended an intensive outpatient program ("IOP").  He had been rushed from school to the

emergency room to treat a drug overdose.  He had been on the streets and had run away from an

emergency treatment center.  His parents were fighting to save his life and providers from three

facilities recommended that he receive long-term residential treatment.

**a.  Outpatient treatment had not been effective for S.L.**

S.L. exhibited anger outbursts by age 4 and by age 12 he had been "suspended from

school for fighting and pushing a classmate to the ground."  AR 376.  He had also begun to

self-harm by cutting.  *Id*.  "...[C]ounseling was again sought...through Randy Parks, a

psychologist" and "[t]his weekly treatment lasted for over 2 years until [S.L.] moved to Seattle"

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 13 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

in the fall of 2014.  *Id*.  S.L. received additional treatment through an IOP at Compass Northbrook at age 13.  AR 377.  S.L. experienced "a significant loss, the death of his older cousin in a bombing in Afghanistan, in January 2014.  After that, S.L.'s parents reported, he experienced increasing struggles."  Dkt. #29-4, at p. 5 (Dr. Kraus).

S.L.'s condition deteriorated after his move to Seattle (Fall 2014), despite his intent to "start off fresh" and his parents' commitment to his treatment.  AR 573 (neuropsychologist Dr. Allison Brooks).  S.L.'s Level I appeal explained:

> …our family relocated to Seattle and **we sought immediate weekly counseling for [S.L.] with Brandon Roark**, who was then working with Brooks Powers Group.  **[S.L.] also saw Dr. Howard Kwon in Bellevue, Washington in an effort to continue to manage his illness with medicine**.  Dr. Kwon also diagnosed [S.L.] with ADHD and General Anxiety Disorder.
>
> Early in the transition period to Seattle, **[S.L.] again engaged in harming himself** by cutting his legs and arms with a knife.
>
> At the end of [S.L.'s] freshman year of high school **we hired an education consultant to help us find a more appropriate school for [S.L.]** as the Seattle Public School, which he was attending, could not help him with his worsening ADHD and anxiety.  Also, at this time to confirm that we were still pursuing the right path, **we submitted [S.L.] for a complete neurological testing with Allison Brooks, Ph.D**., a licensed psychologist and co-founder of the Brooks Powers Group.

AR 377 (emphasis added).  "**[S.L.] also began seeing Dr. Christina Clark, a psychiatrist** working with Seattle Children's Psychiatry and Behavioral Medicine Department," whom his parents "thought might be able to address both his mental health issues."  *Id*.

Despite Dr. Brooks' evaluation and the engagement of an education consultant, S.L.'s parents "could not find a school in the area that would allow [S.L.] to continue to live at home and address his disorders, so in the fall of 2015 he went back to his public high school to begin his sophomore year" with an individualized education plan.  *Id*.  However, S.L.'s substance use

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 14 of 24

1

and mental health disorders escalated, with dangerous behaviors that intensified in the fall of

2

2015.  His parents explained in the Level I Appeal:

3

> [S.L.] started out his Sophomore year fairly strong but then old patterns started to
> arise and he began to crash. Despite only working with [S.L.] for a few months,
> Dr. Clark was very concerned about his increasing abuse of drugs and was not
> sure she was the best fit to treat him.  She was treating the ADHD and Anxiety,
> but his drug abuse was becoming more of a primary concern.  He was now 15.

*Id*.  "[S.L.]'s behavior begin to spiral out of control" (*id*.):

> He **repeatedly stole money from his brothers and us**. He purchased a $450
> vaporizer with our credit card and was charging other items to our credit card
> without permission.  He was **using the computer to look at pornography sites,
> marijuana sites, and escort services**. [S.L.] **admitted to using marijuana and
> drinking alcohol. [S.L.] had anger issues.  He was defiant, threatening,
> running away, hanging out with the homeless, and was consistently physical
> with all family members.  On two separate occasions the police were called to
> address his behavior**.  He continued to destroy property, threatened his family,
> stopped going to school, and began drinking, getting high, taking pills with more
> frequency and he admits to doing even more drugs.  One morning his school
> called as he had thrown up all over himself by 8:30 am.  **We rushed him to
> Seattle Children's Hospital for an evaluation where it was determined that
> the vomiting was a result of marijuana and Xanax ingestion**.  At this point, he
> **began counseling from Lisa Chinn, LMHC**, who works in the Psychiatry and
> Behavioral Medicine Unit of Seattle Children's Hospital.

*Id*. (emphasis added).

> ### b.  S.L. was admitted to Catalyst for treatment of mental health and substance use disorders that had resulted in life-threating behaviors.

S.L.'s parents described the life-threatening events that ultimately led them to seek

emergency in-patient care for S.L., as recommended by his treatment team:

> On New Year's Eve [2015] [S.L.] was completely out of control. He kept running
> away to go seek out friends to party.  I found him "hanging out" with a number of
> homeless folks, trying to sneak into the home out of which we had just moved and
> eventually I ended up chasing him around a park for about an hour.  He was
> looking for drugs and running away.  The next day **I took him to
> Lakeside-Milam in Burien, Washington to keep him safe.  He stayed there for
> 2 days before he ran away** and somehow found his way home, which is a
> 30-minute drive away.  He **remained at home for the next week, but he was**

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 15 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

**still not going to school, he was destructive to himself and others, and he kept running away and hanging out with homeless people "to get drugs" which often put himself in dangerous and unsafe situations. We consulted with Lisa Chinn and one of the Dr.'s on the care team. They recommended strongly that [S.L.] go to a locked facility for his safety.** Since the State of Washington does not have locked facilities for minors, on January 9, 2016, we admitted Simon to Northwest Behavioral Healthcare Services ["NBHS"] outside of Portland, Oregon, an emergency treatment center... He stayed there for the maximum amount of time they permitted, leaving on February 16, 2016.

AR 378 (emphasis added).

S.L.'s treating therapist at NBHS, Shalaine Linrud, MSW, explained that S.L. had been admitted to NBHS with "escalated substance use, anxiety, ADHD, suicidal ideation, and self harm" and had "continued to struggle significantly" while at NBHS "despite having a therapist, chemical dependency counselor, and psychiatrist." AR 391. She stated that S.L. also struggles greatly "participating appropriately in family therapy sessions," and "to take accountability for his actions, becomes angry when he receives consequences for his actions, and becomes extremely hostile when talking about what it would look like to return home." *Id*.

Ms. Linrud also stated, "Unfortunately, during his time at Northwest Behavioral [S.L.] has continued to state that he intends to continue using substances," "will probably run away from home and live on the streets, and...has no intention of going back to school." *Id*. She concluded, "I do not feel confident that he has the ability to return home successfully at this time," adding, "He continues to pose significant risk to himself. He is at extreme high risk for relapse, running away, and self-harm." *Id*. Accordingly, she recommended that S.L. receive "long-term therapeutic care in a highly structured setting" after his discharge from NBHS. *Id*. No rational practitioner would have recommended that S.L. return home after his discharge from NBHS.

After S.L.'s discharge from NBHS in February 2016, S.L. was enrolled in Bridges

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

Academy, a therapeutic boarding school, but was quickly dismissed after being "verbally abusive to the director, thr[owing] a desk out a second story window, punch[ing] holes in the wall, destroy[ing] other property and r[unning] away twice in two days."  AR 378.

      S.L. was then admitted to Evoke where, during the three months he received mental health treatment in the wilderness, he finally made some progress.  Despite his progress, however, at discharge, S.L. continued to display significant destructive behaviors and symptoms that showed that long-term residential treatment was medically necessary.  Dr. Huffine explained:

1. S.L. "displayed difficulty in managing [his high] impulsivity throughout his stay" at Evoke and still struggled with anxiety at discharge.  AR 394.

2. S.L. "expresse[d] a desire to remain abstinent from his drugs and alcohol in the future, although [he] expresses ambivalence of his ability to do so" and "is therefore at increased risk for relapse…." AR 395.  Dr. Huffine was "extremely concerned" about the risk of relapse" in the areas of conduct problems, social difficulties, anxiety, and substance abuse," and warned, "Returning home, even for a few days, would place him at great risk..."  AR 396.

3. "Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of functioning.  [S.L.] remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies he has learned at Evoke without a structured setting."  *Id*.

Dr. Huffine concluded, "if any long-term gains are to be made, and if [S.L] is to have a reasonable chance at long-term success, he must be in a residential or therapeutic boarding school setting after Evoke so that he can practice and internalize the tools he learned at Evoke."  *Id*.

/ /

/ /

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 17 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

      **c.  S.L. exhibited destructive behaviors and remained at great risk of relapse through the close of the record.**

Defendants' assertion that according to Catalyst's psychiatric evaluation, S.L. "suffered from ADHD and anxiety" that "did not require residential treatment" (*Id.*, at p. 18) ignores that S.L. continued to struggle even in Catalyst's highly structured setting.  "In the beginning," explained Lisa Ann Dickman, S.L.'s primary therapist at Catalyst, S.L. struggled to meet "basic safety expectations" and to "regulate his emotions" and engaged in "arguing, blaming, playing the victim, making excuses, verbal threats, threatening self-harm and suicide or escaping by running from the program or leaving group."  AR 319 (10/25/16 letter).

Ms. Dickman also explained in her October 25 letter that five months into treatment at Catalyst, SL was still struggling, despite "daily individual, weekly family and daily group therapies…" (AR 320):

> …He has also struggled to regulate his emotions and his moods tend to change without warning. **Constant supervision has had to be enforced as has doubling up on supportive services [two therapists, two student mentors and two Element coaches.  [S.L.] is very needy emotionally, and physically struggles to ever feel like what he has is enough**.

AR 319 (emphasis added).  Ms. Dickman described Catalyst's intense, daily treatment program:

> To help [S.L.] work to minimize his negative coping patterns and reduce symptoms of his depression, anxiety and oppositional defiance, **we engage him in daily individual, weekly family and daily group therapies, for a minimum of 9 hours of therapy per week**.  He is now down to only one or two individual sessions per week so he has made some good progress. We also incorporate daily physical exercise (running at the track, swimming, lifting weights, etc) and have two recreational days where we bike, hike, ski, or do community service.  We have also started [S.L.] on a mood stabilizer in hopes of helping him better regulate.

AR 320.[1]  Dr. Kraus summarized:

---

[1] Premera argues that Ms. Dickman "did not disagree" with Premera's Dr. Small when, on May 25, 2016, and told her "there was no documentation of symptoms or symptom severity meeting

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Throughout S.L.'s time at Catalyst, he had a variety of negative focuses, depressive symptoms, acting out behaviors, anxiety, ADHD symptoms. Although he would have periodic moments of improvement and better trust in working with staff, it was evident S.L. was not stable enough to leave the program for a less restrictive setting.  Throughout the records reviewed, S.L. would demonstrate small positive steps despite his ongoing serious struggles.  For example, he would also have days where he had a positive attitude joking around with peers and mentors and playing board games.  But then S.L. would have days when even he described feeling depressed.  He attempted to run from the program on July 27, 2016.  He had ingested two empty bottles of cough syrup.  After he was found he was taken to the emergency room for assessment.  …**There are a variety of issues like this that occurred despite the intensive treatment provided at Catalyst that reflect the severe and unstable nature of S.L.'s need for residential treatment**.

Dkt. #29-4, at p. 11 (emphasis added).

### d.  S.L.'s providers showed that Catalyst's residential treatment was medically necessary.

Defendants ignore and fail to address S.L.'s deceitful, defiant, violent, self-harming, drug-seeking and aggressive behaviors that had not abated when Premera issued its final denial decision, five months into Catalyst's treatment.  Defendants extract snippets from Ms. Dickman's records (*see* e.g. Dkt. #75, at p. 23: "Ms. Dickman, S.L.'s therapist at Catalyst, described S.L.'s difficulty at Catalyst following rules and controlling his emotions." (citing AR 2267 [AR 319])).  However, defendants fail to address or refute the basis for her opinion that continuing residential treatment was medically necessary:

---

our medical necessity criteria for RTC."  Dkt. #75, at p. 12 (quoting AR 2048).  However, the lack of "documentation" he complained of resulted from Premera's unreasonable 90-minute deadline for records and did not mean Catalyst's treatment was not medically necessary.  *See* p. 9, *supra*.  In addition, Dr. Small's note shows mechanical application of the InterQual Criteria, with an improper focus on acuity, in his discussion with Ms. Dickman.  *See* p. 6, *supra*.  After having observed S.L. for five months, Ms. Dickman was unequivocal in her opinion that Catalysts's residential treatment was medically necessary – an opinion also held by S.L.'s providers at NBHS and Evoke.  *See* Dkt. #77, at p. 16; p. 20, *infra; See also* Dkt. #77, at pp. 22-23.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 19 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

> At this time, it is recommended that Simon continue at RTC [residential treatment center] level treatment. **If he were to go home at this time it is very likely he would quickly return to his drug use, manipulations, lying and it wouldn't be long before he began to engage his self-harm and suicidal gestures**. [S.L.] is learning to be aware of his negative coping patterns and make accountable decisions to not engage them, or if he does, to get out of the patterns once recognition occurs. He is learning to regulate and control himself, take accountability for himself, forgive and work through resentments, look at his substance abuse, the impact it has had on him as well as others in his life and is beginning to show small steps forward in accepting boundaries. However, these skill sets take time and, with Simon, they are taking time and more man power. **There is no way his parents could take him home and offer him the amount of support and redirection he needs to be successful**.

AR 320 (emphasis added). Ms. Dickman's opinion is consistent with and supported by the opinions of Ms. Linrud, Dr. Huffine and Dr. Kraus. *See* Dkt. #77, at p. 22.[2]

Dr. Kraus, a board-certified clinical psychiatrist with decades of experience treating patients and directing programs in outpatient, hospital and adolescent treatment centers (Dkt. #29-4, at pp. 3-4) and "more than 23 years of experience in evaluating and treating children, adolescents, and young adults with various levels of care, including RTC's" (*id.*, at p. 14), explained that while at Catalyst,

> …S.L. showed improvement, but with setbacks at times. He had a suicidal attempt, he had social struggles, and other difficulties. However, he continued to be involved with treatment in a reasonably consistent fashion and in general continued to show improvement. Based on the last notes from Catalyst in the record reviewed, S.L. continued to struggle in areas of social interactions, impulse

---

[2] …introduction of evidence beyond the administrative record could be considered necessary" in "'**claims that require consideration of complex medical questions or issues regarding the credibility of medical experts**; the availability of very limited administrative review procedures with **little or no evidentiary record**; …instances where the payor and the administrator are the same entity and **the court is concerned about impartiality**; …and circumstances in which there is **additional evidence that the claimant could not have presented in the administrative process**.'" *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993) (en banc)) (emphasis added).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

control, recurrent depressive symptoms, and anxiety. **The benefit of a safe, secure 24-hour a day residential treatment program was clear. As of late July of 2016, S.L. was still struggling at Catalyst. There were areas of improvement but ongoing areas of struggle**.

*Id*., at p. 22 (emphasis added). Dr. Kraus concluded:

In sum, despite extensive evidence supporting S.L.'s admission and continued placement in a residential treatment program, consistent with generally accepted standards, the authorization was denied based upon assertions that 1. There was a lack of acuity. 2. S.L. was not at risk to himself or others. 3. S.L.'s condition had not deteriorated to the point that the only alternative was Residential Care.

S.L.'s residential treatment was wrongly denied based on these three criteria. First of all, residential treatment is not offered to only those who are at an acute risk of harm to self or others. That is the treatment criteria for inpatient hospitalization. In fact, residential programs are not set up to treat adolescents who are at an acute risk for harm or suicidal. Exceptions could be superficial self-mutilatory behavior, but that is not what we are talking about here. The statement that S.L.'s presentation does not rise to a level of residential care is arbitrary and not based on the symptoms of his condition upon which all of his treating providers (both his community providers and those at the residential program) have commented.

…the overemphasis on the Premera InterQual criteria on acuity prevent the application of generally accepted admission criteria and continuation of stay criteria for chronic Disorders that may not warrant hospitalization but will not improve with and/or may deteriorate in the absence of 24 hour care. This can include alcohol and substance abuse, chronic depressive and anxiety symptoms among others. Throughout the Premera records, there is no acknowledgement of S.L.'s diagnoses of alcohol and substance abuse or the comorbid problems with his depression and anxiety.

*Id*., at p. 24. Dr. Kraus concluded:

The statement that S.L.'s condition did not meet criteria for Residential Treatment is absurd. **Any reasonable expert who works with children with chronic depression, anxiety, alcohol and substance abuse, who have had patients with such types of significant struggles as S.L. has had, would have recommended residential treatment to intervene in a safe, effective, timely and consistent manner**. All of S.L.'s treating providers felt that he was in need of such treatment. In S.L.'s case, the overemphasis by Premera on acuity prevented coverage for his admission and continuation of stay criteria for chronic disorders that may not warrant hospitalization but will not improve (and may deteriorate in the absence of 24-hour therapeutic care). **There is simply no evidence that any**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**less restrictive program contracted with Premera in S.L.'s home community was available to safely and appropriately treat S.L. at the time**.

*Id*. (emphasis added).

With no qualified expert supporting Premera's denial decision, defendants argue that the decision "[was] upheld by an independent review organization" and therefore "rests on a reasonable basis." Dkt. #75, at p. 21. Yet they assert that the applicable standard of review is *abuse of discretion*. *Id*., at p. 16. Defendants cannot have it both ways.

If the Court considers the IRO decision (AR 1551-1557), then the applicable standard of review is de novo. *See K.F. v. Regence BlueShield*, No. C08-0890RSL, 2008 U.S. Dist. LEXIS 69150, at *6 (W.D. Wash. Sep. 10, 2008) ("Regence's adoption and implementation of the IRO's decision was mechanical and did not involve the exercise of discretion. The *de novo* standard of review therefore applies."); *Alexandra H. v. Oxford Health Ins., Inc*., No. 11 Civ. 23948, 2013 U.S. Dist. LEXIS 110482, 2013 WL 4002883, at *9 (S.D. Fla. Aug. 6, 2013) ("Accordingly, as the New York external-appeal process requires a plan to divest its discretion in favor of the external reviewer's decision, a de novo standard of review is appropriate here." (citing *K.F.*)).

If, on the other hand, the Court reviews for abuse of discretion, as Premera argues it should, it should not consider the IRO decision, issued nine months after Premera's final denial decision. *See Yox v. Providence Health Plan*, No. 3:12-cv-01348-HZ, 2013 U.S. Dist. LEXIS 181547, at *13-14 (D. Or. Dec. 31, 2013), affirmed, 659 Fed. Appx. 941, 943-44 (9th Cir. 2016) ("The record for judicial review of benefits determinations under ERISA is 'the record upon which the plan administrator relied in making its benefits decision[.]' *Stephan* [*v. Unum Life Ins. Co. of Am*., 697 F.3d 917, 930 (9th Cir. 2012). Because the IRO decision was not part of the record Defendant relied upon in making its decision, I will not consider the IRO decision as part

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - Page 22 of 24

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

of the administrative record in determining whether Defendant abused its discretion by denying Plaintiff's claim.").

In sum, Premera's conclusion that S.L.'s residential treatment was not medically necessary is illogical and implausible.  Premera's denial decision did not address medical necessity.  *See* pp. 8-10, *supra*.  Premera's Level I appeal consultant, Dr. Holmes, improperly addressed S.L.'s presentation on a single day and failed to apply the InterQual Criteria's look-back period.  *See* pp. 10-11, *supra*.  Premera's Level II appeal panel did not include a qualified mental health expert or address medical necessity.  *See* pp. 11-12, *supra*.  In addition, Premera failed to comply with the Federal Mental Health Parity Act in adopting and applying the InterQual Criteria, failed to correctly apply the plan's terms and failed to correctly apply the InterQual Criteria.  *See* pp. 4-8, *supra*.  For all of these reasons, Premera's denial decision was erroneous and an abuse of its discretion.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

1

### III.   CONCLUSION

2    For the foregoing reasons, the Court should deny Defendants' Motion for Summary

3    Judgment.

4    DATED:  February 27, 2023

5                                                      SIRIANNI YOUTZ SPOONEMORE
6                                                      HAMBURGER

7                                                      By:  *s/ Eleanor Hamburger*
                                                        By:  *s/ Richard E. Spoonemore*
8                                                      Eleanor Hamburger (WSBA #26478)
9                                                      Richard E. Spoonemore (WSBA #21833)
                                                        3101 Western Avenue Suite 350
10                                                     Seattle, WA 98121
11                                                     Telephone: (206) 223-0303
                                                        Facsimile: (206) 223-0246
12                                                     ehamburger@sylaw.com  rspoonemore@sylaw.com

13                                                     MEGAN E. GLOR ATTORNEYS AT LAW
14
                                                        By:  *s/ Megan E. Glor*
15                                                     Megan E. Glor (OSB #930178) *(pro hac vice)*
16                                                     707 NE Knott Street, Suite 101
                                                        Portland, OR 97212
17                                                     Telephone: (503) 223-7400
18                                                     Facsimile: (503) 751-2071
                                                        megan@meganglor.com
19
20                                                     Attorneys for Plaintiff S.L.

21                                                     *I certify that the foregoing contains 7,680 words,*
22                                                     *in compliance with the Local Civil Rules.*

23

24

25

26