1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

S.L., by and through his parents and guardians,
J.L. and L.L.,

                Plaintiffs,

          v.

PREMERA BLUE CROSS, AMAZON
CORPORATE LLC GROUP HEALTH AND
WELFARE PROGRAM, and AMAZON
COPRORATE LLC,

                Defendants.

Case No. C18-1308RSL

ORDER ON SUMMARY
JUDGMENT

This matter comes before the Court on defendants' motion for summary judgment (Dkt. # 75) and plaintiffs' motion for summary judgment (Dkt. # 77). Plaintiffs seek to recover benefits under the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Specifically, plaintiff S.L. and his parents allege that in denying coverage for S.L.'s stay at a residential treatment facility in Utah called Catalyst, defendants violated the Amazon Corporate LLC Group Health and Welfare Plan's terms of coverage. Having reviewed the submissions of the parties and the remainder of the record, the Court denies plaintiffs' motion for summary judgment and grants defendants' motion for summary judgment.

## I.    MOTIONS TO SEAL

As a threshold matter, the Court addresses both parties' motions to seal. While there is a strong presumption of public access to the Court's files, a document that a party seeks to attach

1  to a dispositive motion may be filed under seal so long as the party shows "compelling reasons"
2  to do so. *See Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178-81 (9th Cir. 2006).

3      **A. Motion to Seal Declaration**

4      Plaintiffs seek to file Exhibit A to the Declaration of Eleanor Hamburger in Support of
5  Plaintiffs' Motion for Summary Judgment (Dkt. # 79-1) under seal "on the basis that the
6  documents are deemed confidential by defendants for proprietary business purposes and subject
7  to a protective order in another case." Dkt. # 80 at 1. The Court finds there are compelling
8  reasons to file the exhibit under seal and accordingly GRANTS the motion.

9      **B. Motion to Seal Administrative Record**

10      Defendants seek to file the Administrative Record (Dkt. # 90) under seal on the basis that
11  it contains Health Insurance Portability and Accountability Act of 1996 ("HIPPA") protected
12  information, specifically, plaintiff S.L's sensitive personal health information. Dkt. # 89 at 2-3.
13  The Court finds there are compelling reasons to file the record under seal and accordingly
14  GRANTS the motion.

15  **II.    BACKGROUND**

16      **A. The Plan**

17      Plaintiff S.L. is a dependent of his father J.L., a participant in the Amazon Corporate LLC
18  Group Health and Welfare Plan (the "Plan"). Dkt. # 1 at ¶ 1. The Plan is an employee welfare
19  benefit plan governed by ERISA. *Id.* at ¶¶ 3-4. Amazon Corporate LLC is the "Plan Sponsor"
20  and "Plan Administrator"; as such, it is a fiduciary under ERISA. *Id.* The Summary Plan
21  Description provides that the Plan is self-funded by Amazon ("the Group"), meaning that the
22  Group is financially responsible for the payment of plan benefits. Dkt. # 1-1 at 3.

23      The Group has the final discretionary authority to determine eligibility for benefits and
24  claims and to construe the terms of the Plan. *Id*. However, the Group has delegated discretionary
25  authority to Premera. *Id.* The Summary Plan Description informs members that Premera is the
26  "Claims Administrator," and that the Group has delegated "the discretionary authority to
27  determine claims for benefits and to construe the terms used in [the Plan]" to Premera. *Id.*

28      **i.  Medically Necessary**

ORDER ON SUMMARY JUDGMENT - 2

The relevant issue in this case is whether the residential treatment S.L. received as a minor at Catalyst was "medically necessary" under the terms of the Plan. The Summary Plan Description defines "medically necessary" as follows:

> Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>    • In accordance with generally accepted standards of medical practice;
>    • Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
>    • Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

Dkt. # 1-1 at 76. The Summary Plan Description also states that "Premera Blue Cross has developed or adopted guidelines and medical policies that outline clinical criteria used to make medical necessity determinations." *Id.* at 46. In evaluating S.L.'s claim, Premera utilized a Medical Policy created by InterQual, which develops evidence-based care guidelines for use by healthcare and government organizations. AR at 2700-18.

### ii.  InterQual Criteria

The relevant InterQual Criteria – InterQual's 2015 Residential & Community-Based Treatment Criteria – sets forth the following requirements for "Psychiatric Residential Treatment Center" care. AR at 2704. First, one of the following symptoms must be present within the last week: (1) disruptive behavior[1]; (2) psychomotor agitation/retardation; (3)

---

[1] Disruptive behavior is defined as one of the following: physical altercation/angry outbursts, destruction of property, easily frustrated *and* impulsive, sexually inappropriate/aggressive/abusive, runaway from facility/home pass, persistent rule violations. AR at 2704 (emphasis in original).

depersonalization/derealization; (4) hypervigilance/paranoia; (5) psychiatric medication refractory/resistant *and* symptoms of one of the following increasing/persisting: (a) anxiety *and* associated symptoms, (b) depressed/irritable mood *and* associated symptoms, (c) hypomanic symptoms, (d) obsessions/compulsions, (e) psychosis and associated symptoms; (6) non-suicidal self-injury; (7) suicidal/homicidal ideation without intent; or (8) symptoms/behavior improved and discharge planned within next week *and* either: (a) treatment goals are not met or (b) family/guardian requires further intervention and return to family planned. *Id.* (emphasis in original).

Additionally, the patient must exhibit one of the following functional impairments: (1) unable/unwilling to follow instructions/negotiate needs; (2) interpersonal conflict[2]; (3) repeated privilege restriction/loss of privileges; or (4) improved independent functioning, but both: (a) discharge planned within the next week and (b) therapeutic passes planned to transition to alternate level of care. *Id.*

Finally, the patient must be receiving all of the following services: (1) psychiatric evaluation at least one time per week; (2) clinical assessment at least one time per day; (3) individual/family psychoeducation; (3) individual/group/family therapy at least three times per week; (4) implementation of a behavioral contract/symptom management plan; and (5) school or vocational program. *Id.*

### B. S.L.'s History

S.L.'s parents report that he has a long history of mental health, social, and behavioral issues, including diagnoses of ADHD and Generalized Anxiety Disorder at age 12. AR at 376. They further report that between the ages of 12 and 14, S.L. engaged in self-harm, was suspended from school twice,[3] and was diagnosed with depression. *Id.* at 376-77. He received

---

[2] This can manifest as (a) accusatory/threatening/manipulative; (b) hostile/intimidating; (c) poor/intrusive boundaries; or (d) unable to establish positive peer/adult relationships. AR at 2704.

[3] "Immediately following, and as a result of" the events of his first suspension, S.L. was admitted for intensive outpatient care three days a week. AR at 377.

1  weekly counseling during much of this time, as well as prescription medications to address his
2  diagnoses. *Id.*

3      During S.L.'s sophomore year of high school (2015-2016), his parents pursued an
4  Individualized Education Plan with his public school to help address his disorders. *Id.* at 377.
5  S.L. also began seeing Dr. Christina Clark, a psychiatrist in Seattle, to treat his ADHD and
6  anxiety. *Id.* However, Dr. Clark noted that S.L.'s "drug abuse was becoming more of a
7  concern," specifically, S.L.'s regular alcohol abuse, as well as his use of Xanax and marijuana.
8  *Id.* His father reports that S.L. ran away from home several times looking for drugs during this
9  time. *Id.* Subsequently, S.L. began receiving counseling from Lisa Chinn, a licensed mental
10  health counselor at Children's Hospital. *Id.* His father reports that following another episode of
11  S.L. running away from home, Ms. Chinn and a doctor on S.L.'s care team "recommended
12  strongly that [S.L.] go to a locked facility for his safety." *Id.*

13      On January 9, 2016, S.L.'s parents admitted S.L. to Northwest Behavioral Healthcare
14  Services ("NBHS"), an emergency treatment center outside of Portland, Oregon, with a dual
15  diagnosis of mental health and substance abuse issues. *Id.* at 633. S.L. remained at NBHS until
16  February 16, 2016. *Id.* Premera covered S.L.'s treatment at NBHS. Dkt. # 1 at ¶ 21. Shortly after
17  leaving NBHS, S.L. enrolled at Evoke Therapy ("Evoke"), a wilderness program in Utah. *Id.* at
18  ¶ 22. Premera also covered S.L.'s treatment at Evoke. *Id.* He remained at Evoke from February
19  18, 2016 to May 16, 2016, when he was immediately transferred to Catalyst. AR at 414, 1835.
20  Catalyst is a licensed residential treatment center also located in Utah that is "less restrictive"
21  than Evoke. Dkt. # 1 at ¶ 1, 24.

22      In a discharge summary from Evoke, psychologist Dr. J. Huffine noted the strides that
23  S.L. had made during his stay at the program, but stated that he remained "extremely concerned
24  regarding [S.L.]'s risk for relapsing in the areas of conduct problems, social difficulties, anxiety,
25  and substance abuse if he were to return to his home environment." *Id.* at 396. Accordingly, Dr.
26  Huffine recommended that S.L. be placed "in a residential or therapeutic boarding school setting
27  after Evoke so that he can practice and internalize the tools he learned at Evoke." *Id.*

28              **C. Initial Denial**

1    On May 13, 2016, Catalyst submitted a request to Premera for preauthorization of

2    coverage in advance of S.L.'s anticipated admission. AR at 2042. The request included records

3    from S.L.'s admission to Evoke but did not contain any medical records related to S.L.'s

4    admission to Catalyst. AR at 1858. Premera denied the request on the basis that "[w]ithout

5    information about your recent and current condition, your health plan does not have enough

6    information to be able to tell if residential treatment to treat a mental health condition is

7    medically necessary. Therefore, mental health residential treatment is denied as not medically

8    necessary." *Id.* at 1858.

9    **D.  Level One Appeal**

10    On September 16, 2016, S.L.'s parents initiated a Level I appeal of the decision. *Id.* at

11    375-85. Premera sent plaintiffs' Level I appeal to an independent review organization. *Id.* at

12    624. A physician, board certified in child and adolescent psychiatry, reviewed plaintiffs' appeal

13    submission and records, as well as the Plan language and the InterQual Criteria. AR at 624-28.

14    The reviewing physician concluded that the "service provided (Ongoing Residential Treatment

15    5/17/16-ongoing) is not medically necessary based on the provided medical policy and plan

16    language." *Id.* at 625. Subsequently, Premera upheld its denial, stating that "there was no

17    medical necessity for the admission and ongoing stay in a residential treatment setting starting

18    May 17, 2016." *Id.* at 1185-87.

19    **E.  Level Two Appeal**

20    On November 16, 2016, S.L.'s parents initiated a Level II appeal of Premera's denial of

21    benefits. AR at 939-45. Premera's review panel consisted of a physician Medical Director

22    board-certified in family medicine, a National Accounts Customer Service Manager, and an

23    Operations Manager. *Id.* at 1189. The panel reviewed, *inter alia*, the independent physician

24    review conducted in conjunction with the Level I appeal. *Id.* On December 20, 2016, the panel

25    again upheld the denial, concluding that S.L.'s stay at Catalyst was not medically necessary

26    because "criteria were not met for severe functional impairment." *Id.*

27    **F.  Independent Review**

28

ORDER ON SUMMARY JUDGMENT - 6

1    On July 7, 2017, S.L.'s parents requested an Independent Review Organization ("IRO")

2    review[4] of Premera's decision. AR at 296. Pursuant to the Washington statute governing IRO

3    reviews, the Center for Health Dispute Resolution/MAXIMUS was selected as the reviewer for

4    S.L.'s claims. *Id.* at 1566. The IRO physician reviewer determined "the services at issue were

5    not and are not medically necessary for treatment of the member's medical condition." *Id.* at

6    1551. Therefore, MAXIMUS decided Premera Blue Cross's denial of the services at issue

7    should be upheld. *Id.*

8    **III.   LEGAL STANDARDS**

9    **A.   Standard of Review**

10   "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de*

11   *novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority

12   to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire &*

13   *Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where, as here, the plan "does grant such

14   discretionary authority, we review the administrator's decision for abuse of discretion." *Saffon v.*

15   *Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008); *see also* AR

16   at 812 (explaining that Amazon "has delegated to [Premera] the discretionary authority to

17   determine claims for benefits and to construe the terms used in this plan to the extent necessary

18   to perform our services"). Under this deferential standard, a plan administrator's decision "will

19   not be disturbed if reasonable." *Conkright v. Frommert,* 559 U.S. 506, 512 (2010) (internal

20   quotation marks omitted). This reasonableness standard requires deference to the administrator's

21   benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences

22   that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability*

23   *Plan,* 642 F.3d 666, 676 (2011).

24   However, this familiar standard of review is more complicated in the ERISA context,

25   where the "manner in which a reviewing court applies the abuse of discretion standard . . .

26   depends on whether the administrator has a conflicting interest." *Montour v. Hartford Life &*

27

28        [4] Under both Washington and federal law, group health plans must provide independent reviews
     if requested by the member. *See* RCW § 48.43.537; RCW § 48.43.535; 45 C.F.R. § 147.136.

ORDER ON SUMMARY JUDGMENT - 7

*Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). Specifically, "[t]he abuse of discretion standard may be tempered by a degree of skepticism if there are indications of improprieties on the part of an administrator, such as conflicts of interest or procedural irregularities." *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1105 (C.D. Cal. 2011). The Ninth Circuit "requires a district court to consider the precise contours of the abuse of discretion standard in every case before determining whether the applicable standard was violated." *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006)).

Where an administrator is operating under a conflict of interest, "[t]he weight of this factor [on the standard of review] depends upon the likelihood that the conflict impacted the administrator's decisionmaking." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012). For example, if a conflict of interest is established, but is unaccompanied by "any evidence of malice, of self-dealing, or of a parsimonious claims-granting history," the level of skepticism may be low. *Abatie*, 458 F.3d at 968. Conversely, a "court may weight a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Id.* at 968-69 (internal citations omitted).

"A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." [5] *Id.* at 972. Where there has been an "ongoing, good faith exchange of information between the administrator and the

---

[5] If the administrator's "procedural defalcations are flagrant, *de novo* review applies" and "the court is not limited to the administrative record and may take additional evidence." *Abatie*, 458 F.3d at 973. Most of the time, procedural errors "are not sufficiently severe to transform the abuse-of-discretion standard into a *de novo* standard" so typically, the court must simply "weigh any procedural errors as a factor in determining whether [the administrator] abused its discretion." *Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1040 (9th Cir. 2014). Here, plaintiffs do not argue that the procedural errors are so flagrant as to require *de novo* review.

claimant," the court should give the administrator's decision broad deference notwithstanding a minor irregularity. *Id.* A more serious procedural irregularity may weigh more heavily. *Id.*

Plaintiffs argue that the Court should review Premera's decision under the abuse of discretion standard tempered with skepticism, as they allege that Premera is operating under a conflict of interest and their claim has suffered from several procedural irregularities. Dkt. # 77 at 14-16. As discussed further below, the Court finds that plaintiffs have failed to establish a conflict of interest but have established procedural irregularities. The Court will accordingly assign appropriate weight to the procedural irregularities in its review for abuse of discretion.

**B.  Impact of the IRO Decision on Standard of Review**

The parties also debate whether the Court should consider the IRO decision, made by an anonymous physician reviewer "board certified in psychiatry with sub-specialty certification in child and adolescent psychiatry and is actively practicing," in its review of Premera's denial. AR at 1553.

Plaintiffs argue that if the Court considers the decision of the IRO, it must conduct review of the administrator's decision *de novo*. Dkt. # 85 at 26; Dkt. # 87 at 16. Plaintiffs rely on this Court's opinion in *K.F. ex rel. Fry v. Regence Blueshield*, No. C08-89RSL, 2008 WL 4223613 (W.D. Wash. Sept. 10, 2008) to support their argument. Dkt. # 85 at 26; Dkt. # 87 at 16-17. However, *K.F.* was decided before the Affordable Care Act amended the "full and fair" appeal processes required by ERISA to include the right to have an adverse benefit determination involving medical judgment reviewed by an IRO. *See Cont'l Med. Transp. LLC v. Health Care Serv. Corp.*, No. C20-115JCC, 2021 WL 2072524, at *3 (W.D. Wash. May 24, 2021) (citing Group Health Plans and Health Insurance Issuers: Rules Relating to Internal Claims and Appeals and External Review Processes, 76 Fed. Reg. 37,208, 37,210–11 (June 24, 2011) (to be codified at 45 C.F.R. pt. 136)). Under these regulations, "[a]n IRO's reversal of an adverse benefit determination is binding upon a plan . . . but an affirmance is not, and a plan may 'voluntarily make[ ] payment on the claim or otherwise provide[ ] benefits at any time, including after a final external review decision[.]'" *Cont'l Med. Transp. LLC v. Health Care Serv. Corp.*, No. 21-35481, 2022 WL 2045385, at *2 (9th Cir. June 7, 2022) (quoting 45 C.F.R.

§ 147.136(d)(2)(iii)(B)(7)(v)); *see also* 45 C.F.R. § 147.136(c)(2)(xi) (explaining that where a plan is subject to an applicable State external review process rather than the Federal external review process described in paragraph (d), "the requirement that the decision be binding [similarly] shall not preclude the plan or issuer from making payment on the claim or otherwise providing benefits at any time"). Accordingly, the Ninth Circuit has found that an IRO's affirmance of an administrator's denial of benefits does not negate the administrator's discretion. *Id.*; *see also Yox v. Providence Health Plan*, 659 F. App'x 941 (9th Cir. 2016) (applying abuse of discretion standard of review where IRO upheld denial of benefits). In light of this more recent law, the Court declines to apply *de novo* review under these circumstances.

Having determined that the abuse of discretion standard applies, the next question is whether the Court may properly consider the IRO decision in reviewing Premera's denial of benefits. When the abuse of discretion standard applies, the Court's review is limited to the administrative record before the plan administrator – the Court may not consider extrinsic evidence. *Abatie*, 858 F.3d at 970; *Jebian v. Hewlett-Packard Co. Empl. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003). Applying this rule, some district courts have concluded that because the IRO decision took place *after* the denial of benefits, it cannot properly be considered part of the administrative record. *See Yox v. Providence Health Plan*, No. C12-1348-HZ, 2013 WL 6887530, at *5 (D. Or. Dec. 31, 2013) ("Because the IRO decision was not part of the record Defendant relied upon in making its decision, I will not consider the IRO decision as part of the administrative record in determining whether Defendant abused its discretion by denying Plaintiff's claim."). Defendants argue against this conclusion, asserting that that "the IRO decision is part of the administrative record because the ACA, which incorporates ERISA's enforcement scheme, requires it." Dkt. # 86 at 9 (citing 45 C.F.R. § 147.136(d)(2)(iii)(A)). Defendants also note that "courts routinely consider the IRO as part of the administrative record." *Id.*; *see Peter B. v. Premera Blue Cross*, No. C16-1904JCC, 2017 WL 4843550, at *4 (W.D. Wash. Oct. 27, 2017); *Tracy O. v. Anthem Blue Cross Life & Health Ins. Co.*, No. C16-422DB, 2017 WL 3437672, at *9 (D. Utah Aug. 10, 2017)); *Cont'l Med. Transp. LLC v*, 2021 WL 2072524, at *4. While it is an unpublished memorandum decision and

thus "not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion," *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (2020) (quoting U.S. Ct. of App. 9th Cir. R. 36-3(a)), the Court finds the reasoning of *Continental Medical Transport LLC v. Health Care Service Corp.* "persuasive," *United States v. Wright*, 46 F.4th 938, 948 n.9 (9th Cir. 2022). Under the logic of that opinion, which explains that an IRO's affirmance of a denial of benefits does not preclude a plan from voluntarily making payment on the claim or otherwise providing benefits, and the corresponding regulations, the Court agrees with defendants that it may consider the IRO in reviewing Premera's denial of benefits for abuse of discretion. *Cont'l Med. Transp. LLC*, 2022 WL 2045385, at *2.

### C. Evidence Outside the Administrative Record

As discussed above, when the abuse of discretion standard applies, the Court's review is limited to the administrative record before the plan administrator – the Court may not consider extrinsic evidence. *Abatie*, 858 F.3d at 970.

There are, however, two exceptions to this general rule. First, "the district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." *Abatie*, 458 F.3d at 970. "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.*

Second, extrinsic evidence may be properly considered when procedural irregularities affect administrative review by, for example, preventing a full development of the administrative record. *Id.* at 973. This second exception, which may be invoked even when a defendant's decision is reviewed for abuse of discretion, allows the Court to "recreate what the administrative record would have been had the procedure been correct." *Id.*

Because the Court's review is typically limited to the administrative record, discovery is not usually permitted in an ERISA case like this one. Here, however, plaintiffs were permitted to seek discovery under the theory that the requested discovery was relevant to their claim that Premera was operating under a conflict of interest. *See* Dkt. # 47; Dkt. # 67. In support of their instant motion for summary judgment, plaintiffs offer two pieces of extra-record evidence:

1  deposition testimony from Premera employee, Robert Small, M.D., taken in another case, Dkt.

2  # 79-1, and a report from plaintiffs' expert, child psychiatrist Dr. Louis Kraus, Dkt. # 29-4.

3      Defendants move to strike both pieces of extra-record evidence on the basis that neither

4  falls into the two delineated exceptions as articulated by the Ninth Circuit. Dkt. # 84 at 22.

5  Specifically, they argue that "[n]either the Kraus opinion nor the Small deposition excerpts from

6  another case are related to any Premera conflict of interest. Instead, Plaintiffs offer this evidence

7  in an attempt to attack the nationally recognized InterQual Criteria that Premera relied on in

8  adjudicating S.L.'s claim." *Id.* at 24. Additionally, defendants argue that "[p]laintiffs do not

9  identify any flaw in the administrative record that resulted from a procedural irregularity." *Id.*

10     Plaintiffs argue that due to myriad procedural errors, "Dr. Kraus's opinion provides the

11  expertise Premera failed to obtain, in disregard of the ERISA regulation and Premera's duty as

12  an ERISA fiduciary." Dkt. # 87 at 17. They further contend that "Dr. Kraus's opinion goes to

13  whether Premera's adoption of InterQual, which is inconsistent with the standard of care and

14  was adopted purely to save money, represents a conflict of interest." *Id.*

15     For reasons discussed further below, the Court does not find that procedural irregularities

16  "prevent[ed] a full development of the administrative record." *Abatie*, 458 F.3d at 973; *cf. Pac.*

17  *Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1040-41 (9th Cir. 2014) (considering

18  materials outside the administrative record proper where, for example, administrative record did

19  not include claimant's hospital records). Furthermore, Dr. Kraus's report does not purport to

20  introduce additional evidence about S.L.'s condition – it simply reviews and evaluates medical

21  records already contained in the record. *See* Dkt. # 29-4. Accordingly, the Court declines to

22  consider Dr. Kraus's report in its review of Premera's decision.

23     As to the conflict of interest exception, the Court notes that the Ninth Circuit has "held

24  the court may consider evidence beyond that contained in the administrative record . . . to

25  determine whether a conflict of interest exists." *Abatie*, 458 F.3d at 970. Thus, the Court will

26  consider Dr. Kraus's report and Dr. Small's deposition testimony solely for the purpose of

27  determining whether a conflict of interest exists.

28                          **D. Summary Judgment Standard**

1    Traditionally, summary judgment is appropriate if there is no genuine dispute as to any
2 material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.
3 56(a). Moreover, "when simultaneous cross-motions for summary judgment on the same claim
4 are before the court, the court must consider the appropriate evidentiary material identified and
5 submitted in support of both motions, and in opposition to both motions, before ruling on each
6 of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting
7 *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir.
8 2001)). The court "rule[s] on each party's motion on an individual and separate basis,
9 determining, for each side, whether a judgment may be entered in accordance with the Rule 56
10 standard." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal
11 Practice and Procedure § 2720 (3d ed. 1998)).

12    However, "[t]raditional summary judgment principles have limited application in ERISA
13 cases governed by the abuse of discretion standard." Stephan, 697 F.3d at 929. "Where, as here,
14 the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary
15 judgment is, in most respects, merely the conduit to bring the legal question before the district
16 court and the usual tests of summary judgment, such as whether a genuine dispute of material
17 fact exists, do not apply." *Id.* at 929-30 (internal quotation marks and citations omitted); *see also*
18 *Bartholomew v. Unum Life Ins. Co. of Am.*, 588 F. Supp. 2d 1262, 1265-66 (W.D. Wash. 2008)
19 ("The administrative record submitted in conjunction with [the] litigation exists as a body of
20 undisputed facts," although "the conclusions to be drawn from those facts are definitely in
21 dispute.").

22    The Ninth Circuit has provided one caveat to this rule. While "[t]raditional summary
23 judgment principles have limited application in ERISA cases governed by the abuse of
24 discretion standard," the "traditional rules of summary judgment" apply to a court's
25 "[c]onsideration of a conflict of interest." *Stephan*, 697 F.3d at 929-30. Thus, as "to issues
26 regarding the nature and impact of a conflict of interest, summary judgment may only be granted
27 if after 'viewing the evidence in the light most favorable to the non-moving party, there are [no]
28 genuine issues of material fact.'" *Id.* at 930 (internal quotation marks and citations omitted).

1   Having determined that abuse of discretion is the appropriate standard of review, the

2   Court now turns to plaintiffs' arguments that this deferential standard should be tempered with

3   skepticism due to (1) Premera's conflict of interest and (2) the procedural irregularities in the

4   administrative review.

5   **IV.   CONFLICT OF INTEREST**

6   "[T]he Supreme Court cautioned that, 'if a benefit plan gives discretion to an

7   administrator or fiduciary who is operating under a conflict of interest, that conflict must be

8   weighed as a factor in determining whether there is an abuse of discretion.'" *Abatie*, 458 F.3d at

9   965 (citing *Firestone*, 489 U.S. at 115 (internal citations and punctuation omitted)).

10   Here, plaintiffs argue that defendants have a "structural" conflict of interest.[6] Dkt. # 77 at

11   14. The Ninth Circuit has "held that an insurer that acts as both the plan administrator and the

12   funding source for benefits operates under what may be termed a structural conflict of interest."

13   *Abatie*, 458 F.3d at 965 (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999));

14   *see also Stephan*, 697 F.3d at 929 (explaining that an organization's "dual role as plan

15   administrator, authorized to determine the amount of benefits owed, and insurer, responsible for

16   paying such benefits, creates a structural conflict of interest"). In this case, there does not appear

17   to be a "structural conflict of interest" as defined by the Ninth Circuit and Supreme Court.[7] The

18   Plan is self-funded by Amazon, meaning the company is "financially responsible for the

19

20   [6] While plaintiffs appear to assert that this Court has previously concluded that a structural

21   conflict of interest exists here, *see* Dkt. # 77 at 14, this is incorrect. The Court previously found that

22   plaintiffs had demonstrated "sufficient evidence of a potential conflict of interest to obtain discovery," Dkt. # 67 at 4; *see also* Dkt. # 47, but made no finding as to whether plaintiffs had conclusively

23   established the existence of a conflict of interest.

24   [7] Plaintiffs argue that the Supreme Court's opinion in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) holds that when "the plan administrator is . . . a professional insurance company," like Premera,

25   "for ERISA purposes a conflict exists." Dkt. # 87 at 6. However, in that case, "Metropolitan Life Insurance Company (MetLife) serve[d] as both an administrator and the insurer of Sears, Roebuck &

26   Company's long-term disability insurance plan . . . . The plan grant[ed] MetLife (as administrator) discretionary authority to determine whether an employee's claim for benefits [wa]s valid; it

27   simultaneously provide[d] that MetLife (as insurer) will itself pay valid benefit claims." *Id.* at 108. Thus, the holding in *Glenn* confirms that the "structural" conflict of interest can apply to "professional

28   insurance companies" who are responsible for both administering and paying benefit claims.

1    payment of plan benefits." AR at 812. Amazon, in turn, has delegated discretionary authority to

2    determine eligibility for benefits and claims and to construe the terms of the Plan to Premera. *Id.*

3    Accordingly, because two different entities are responsible for funding the Plan and

4    administrating the Plan, plaintiffs have failed to show a structural conflict.[8]

5         While plaintiffs cannot establish "structural" conflict, that is not the only kind of conflict

6    of interest in the ERISA context. *Abatie*, 458 U.S. at 967 ("This standard applies to the kind of

7    inherent conflict that exists when a plan administrator both administers the plan and funds it, as

8    well as to other forms of conflict."). Here, plaintiffs argue that "[a]s one of the largest health

9    insurers in the state of Washington, Premera has a financial disincentive to provide coverage for

10   costly adolescent mental health treatment" and "as the paid third-party administrator for the

11   health plan of Amazon, one of the largest corporations in the world, Premera has additional

12   financial incentive to deny claims (i.e., "to show how tough [it is] on claims"). Dkt. # 85 at 7-8.

13        However, "[a]sserting a conflict based on a generalized economic incentive, such as

14   attracting more business through denial of claims, without more, is 'insufficient to rise to the

15   level of a legally cognizable conflict of interest.'" *Eugene S. v. Horizon Blue Cross Blue Shield*,

16   663 F.3d 1124, 1133 (10th Cir. 2011) (quoting *Finley v. Hewlett–Packard Co. Empl. Benefits*

17   *Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004)). Indeed, the District of Alaska

18   case plaintiffs cite in support of their argument, *Mason v. Fed. Express Corp.*, 165 F. Supp. 3d

19   832 (D. Alaska 2016) emphasizes this point, as the plaintiff in that case was able to demonstrate

20   that (1) the employer paid benefit claims out of its own undedicated funds and "therefore has an

21   obvious incentive to hire a Claims Paying Administrator that minimizes benefits awards" and

22   (2) the plan administrator's reviewing neurologist, who had initially concluded that claimant

23

24        [8] There are exceptions to this general rule. While a self-insured disability plan can minimize the
     structural conflict of interest by delegating claim administration duties to a third-party, "[t]he delegation
25   of claims to a third-party does not ensure against a structural conflict of interest because some employers
     may nevertheless influence the third-party administrator's decision making." *Leu v. Cox Long-Term*
26   *Disability Plan*, No. C08-889JAT, 2009 WL 2219288, at *2-3 (D. Ariz. July 24, 2009) (collecting cases
     in which the employer only superficially delegated decision making to a third-party). Plaintiffs have
27   identified no evidence tending to show that the grant of discretion here was superficial, thus, this
     exception does not apply here.
28

1   was disabled, was influenced by the plan administrator's "suggestive request for 'clarification'"

2   to change his recommendation, and subsequently concluded that claimant had not shown that he

3   was disabled. *Mason*, 165 F. Supp. 3d at 848-51. Here, in contrast, plaintiffs have failed to

4   identify specific facts tending to show a conflict of interest.

5        However, plaintiffs have also asked the Court to consider "whether Premera's adoption

6   of InterQual . . . represents a conflict of interest." Dkt. # 87 at 17. Thus, the Court addresses

7   plaintiffs' additional arguments regarding potential conflict of interest below.

8                      **A. InterQual Criteria & Conflict of Interest**

9        Plaintiffs challenge several aspects of defendants' use of the InterQual Criteria in

10  administering plaintiffs' benefits claim. Under the Plan, "medically necessary" treatments are

11  "those covered services and supplies that a physician, exercising prudent clinical judgement,

12  would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an

13  illness, injury, disease or its symptoms" and that are, *inter alia*, "[i]n accordance with generally

14  accepted standards of medical practice." Dkt. # 1-1 at 76. The Plan goes on to explain that

15  "'generally accepted standards of medical practice' means standards that are based on credible

16  scientific evidence published in peer reviewed medical literature generally recognized by the

17  relevant medical community, physician specialty society recommendations and the views of

18  physicians practicing in relevant clinical areas and any other relevant factors." *Id.*

19       As discussed above, the Summary Plan Description states that "Premera Blue Cross has

20  developed or adopted guidelines and medical policies that outline clinical criteria used to make

21  medical necessity determinations." Dkt. # 1-1 at 46. In determining whether S.L.'s stay at

22  Catalyst was medically necessary, defendants used a Medical Policy (the 2015 Residential and

23  Community-Based Treatment Criteria, *see* AR at 624-28) licensed from InterQual, a group that

24  develops evidence-based care guidelines for use by healthcare and government organizations.

25  AR at 2700-18, 2719-24; Dkt. # 84 at 3.

26       Plaintiffs argue that defendants' reliance on the InterQual Criteria was an abuse of

27  discretion. Dkt. # 77 at 15. Specifically, plaintiffs argue that (1) Premera did not adopt the

28  InterQual Criteria "for a clinical reason"; (2) Premera failed to perform a parity analysis before

1    adopting the InterQual Criteria; and (3) the InterQual Criteria impose more restrictive conditions

2    on coverage than the Plan's terms allow.[9]

3                                   **i.  Reason for Adoption**

4         Plaintiffs argue that "Premera did not adopt the InterQual Criteria for a clinical reason."

5    Dkt. # 77 at 16. Instead, they argue that "[t]he purported reasons for its adoption of the Criteria –

6    to "increase efficiency" and "streamline" its appeals process, . . . are aimed at saving money."

7    *Id.* (citing Dkt. # 52 at 5). While defendants acknowledge that increased efficiency was one of

8    the goals Premera had when it adopted the InterQual Criteria, defendants also note that Premera

9    "did not analyze the potential financial impact when it determined whether to adopt the

10    InterQual guidelines." Dkt. # 52 at 6. Moreover, defendants specifically state that Premera

11    "adopted the InterQual criteria because InterQual 'is the most widely used evidenced based

12    clinical care guidelines nationwide and in Premera's service area.'" Dkt. # 52 at 6 (quoting Dkt.

13    # 53-17); *see also* Dkt. # 52 at 6 ("Premera's main goal was to 'implement nationally recognized

14    clinical guidelines . . . which [could] be used in making clinical decisions regarding appropriate

15    care for Premera's customers'" (quoting Dkt. # 53-18)).

16         Federal courts across the country have recognized the widespread adoption of InterQual

17    Criteria and "district courts routinely find that InterQual's criteria comport with generally

18    accepted standards of care." *N.F. by & through M.R. v. Premera Blue Cross*, No. C20-956JCC,

19    2021 WL 4804594, at *4 n.4 (W.D. Wash. Oct. 14, 2021); *see Winter ex rel. United States v.*

20    *Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114-15 (9th Cir. 2020) ("The InterQual

21    criteria, promulgated by McKesson Health Solutions LLC and updated annually, 'are reviewed

22    and validated by a national panel of clinicians and medical experts,' and represent 'a synthesis

23    of evidence-based standards of care, current practices, and consensus from licensed specialists

24    and/or primary care physicians.'"); *Griffin v. Do-Williams*, No. C16-1435WBS-CKD, 2019 WL

25

26         [9] All three of plaintiffs' arguments rely on extra record evidence – particularly the deposition of

27    Dr. Small taken in another case and the report of Dr. Kraus, plaintiffs' expert. *See* Dkt. # 77 at 16-17. Because, as discussed above, the Court may only consider this extra record evidence for the purpose of

28    determining whether a conflict of interest exists, the Court construes these arguments as going to the existence of a conflict of interest.

3975358, at *8 (E.D. Cal. Aug. 22, 2019), *aff'd*, 846 F. App'x 518 (9th Cir. 2021) ("InterQual criteria are a library of evidence-based clinical decision support criteria used to assess the medical necessity of a proposed treatment"); *Norfolk Cnty. Ret. System v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017); *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 114 (1st Cir. 2017); *Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 48 (W.D.N.Y. 2020).

Plaintiffs also point to deposition testimony of Premera employee, Robert Small, M.D., taken in another case, to argue that (1) Dr. Small was the only psychiatrist employed by Premera but was not involved in the decision to adopt the InterQual Criteria; and (2) while Premera adopted the InterQual Criteria for "inpatient hospital behavioral health and residential behavioral health treatment" it "did not adopt all of Interqual's criteria." Dkt. # 77 at 16-17 (citing Dkt. # 79 at 5-9, 10-11, 14). However, plaintiffs fail to explain how either of these asserted facts demonstrate a conflict of interest on the part of Premera.

In light of Premera's well-supported assertion that it adopted the InterQual Criteria because it "is the most widely used evidenced based clinical care guidelines nationwide and in Premera's service area," Dkt. # 52 at 6, the Court finds that, even viewing the evidence in the light most favorable to the plaintiffs, plaintiffs have failed to raise a genuine issue of material fact as to whether Premera's adoption of the InterQual Criteria demonstrates the existence of a conflict of interest.

### iii.   Parity Assessment

Next, plaintiffs argue that Premera's adoption of the InterQual Criteria without performing a written parity analysis, which they allege is a violation of the Parity Act, demonstrates a conflict of interest. Dkt. # 77 at 17.

The Parity Act is a section of ERISA that "requires that benefits in a plan that provides for both (a) medical and surgical benefits and (b) mental health or substance use disorder benefits, must not impose more restrictions on the latter than it imposes on the former." *Danny P. v. Cath. Health Initiatives*, 891 F.3d 1155 (9th Cir. 2018) (citing 29 U.S.C. § 1185a(a)(3)(A)) (internal punctuation omitted). The federal regulations implementing the Parity Act further

1   explain the two types of restrictions (called "treatment limitations" under the Act) that may run

2   afoul of the statute's prohibition. *See* 29 C.F.R. § 2590.712. First are quantitative treatment

3   limitations ("QTLs"), "which are expressed numerically." *See id.* § 2590.712(a) (using "50

4   outpatient visits per year" as an example of a QTL). Second are nonquantitative treatment

5   limitations ("NQTLs"), "which otherwise limit the scope or duration of benefits for treatment

6   under a plan or coverage." *Id.* A group health plan "may not impose" an NQTL on mental health

7   benefits "unless, under the terms of the plan . . . as written and in operation, any processes,

8   strategies, evidentiary standards, or other factors used in applying the [NQTL] to mental health

9   or substance use disorder benefits . . . are applied no more stringently than" those applied to

10  medical or surgical benefits. *Id.* § 2590.712(c)(4)(i).

11      Here, plaintiffs argue that Premera failed to undertake the analysis required to ensure that

12  the adoption of the InterQual Criteria did not result in the application of more stringent NQTLs

13  to mental health benefits. Dkt. # 77 at 17. Importantly, plaintiffs have made clear that they are

14  not bringing a Parity Act claim. Dkt. # 87 at 8. Instead, it appears they are arguing that the

15  violation of the Parity Act demonstrates a conflict of interest.

16      As a threshold matter, plaintiffs have failed to clearly articulate *why* this alleged violation

17  of the Parity Act tends to show that Premera is operating under a conflict of interest. Moreover,

18  it is unclear to the Court that a Parity Act violation occurred.

19      Plaintiffs argue that Premera was required to conduct its own written parity analysis, and

20  that its failure to do so constitutes a Parity Act violation. Dkt. # 77 at 17; Dkt. # 87 at 7-8.

21  Defendants respond that the written analysis requirement did not come into effect until February

22  10, 2021, and thus, any failure to produce a comparative analysis in 2016 cannot constitute a

23  violation of the Parity Act. Dkt. # 84 at 22.

24      Defendants are correct that the 2021 Consolidated Appropriations Act amended the

25  Parity Act "by expressly requiring group health plans . . . that offer both medical/surgical

26  benefits and MH/SUD [mental health/substance use disorder] benefits and that impose NQTLs

27  on MH/SUD benefits to perform and document their comparative analyses of the design and

28  application of NQTLs." DEP'T OF LAB., FAQS ABOUT MENTAL HEALTH AND SUBSTANCE USE

1   DISORDER PARITY IMPLEMENTATION AND THE CONSOLIDATED APPROPRIATIONS ACT, 2021
2   PART 45, at 2 (2021). Plans were required to "make their comparative analyses available to
3   [federal agencies] or applicable State authorities, upon request" beginning 45 days after
4   December 27, 2020. *Id.*; *see also* 29 U.S.C. § 1185a(a)(8)(A).

5       However, plaintiffs argue that "[a]t all relevant times, the NQTL analysis and disclosure
6   requirement has been mandatory." Dkt. # 87 at 7-8. Plaintiffs point to a federal regulation
7   providing that plan members could, upon request, access "instruments under which the plan is
8   established or operated." 29 C.F.R. § 2590.712(d)(3). These "instruments" "include documents
9   with information on medical necessity criteria for both medical/surgical benefits and mental
10  health and substance use disorder benefits, as well as the processes, strategies, evidentiary
11  standards, and other factors used to apply a nonquantitative treatment limitation with respect to
12  medical/surgical benefits and mental health or substance use disorder benefits under the plan."
13  *Id.* Plaintiffs argue that this regulation demonstrates that a written analysis was necessary, and
14  that defendants have abused their discretion by adopting the InterQual criteria without
15  conducting this analysis. Dkt. # 87 at 7.

16      While the Court notes it likely would have been wise for Premera to conduct a more in-
17  depth assessment of InterQual Criteria and its effect on Premera's NQTL parity,[10] it is not
18  convinced that Premera was required to produce a "written comparative analysis" prior to the
19  passage of the 2021 Consolidated Appropriations Act. Indeed, the U.S. Department of Labor
20  FAQ page cited by plaintiffs in their reply, *see* Dkt. # 87 at 7-8, specifically notes that the 2021
21  Act "*amended* [the Parity Act] . . . by *expressly requiring* group health plans . . . to *perform and*
22  *document* their comparative analyses of the design and application of NQTLs." DEP'T OF LAB.,
23  *supra*, at 2 (emphasis added).

24
25

26      [10] Plaintiffs note that Premera appears to have relied on assurances from McKesson during an
    RFP process that it had evaluated the InterQual Criteria for parity compliance and did not produce any
27  independent analysis in discovery. Dkt. # 77 at 17 (citing Dkt. # 78 and Dkt. # 78-1). Defendants do not
    argue to the contrary.
28

ORDER ON SUMMARY JUDGMENT - 20

1    The Court is not convinced that plaintiffs have established a Parity Act violation here.

2    Even if plaintiffs could establish a Parity Act violation, the Court is not convinced that any such

3    violation would establish a conflict of interest. Thus, the Court finds that, even viewing the

4    evidence in the light most favorable to the plaintiffs, plaintiffs have failed to raise a genuine

5    issue of material fact as to whether Premera's adoption of the InterQual Criteria demonstrates a

6    conflict of interest

7                          ### iii.   Criticism of InterQual Criteria

8    Finally, plaintiffs argue that the InterQual Criteria are not consistent with the "Parity

9    [Act] requirements or the standard of care" because its criteria "impose far more restrictive

10   conditions on coverage than the Plan's terms allow." Dkt. # 77 at 17. Plaintiffs argue that

11   adopting the InterQual Criteria into the Plan is akin to interpreting a plan in a manner

12   inconsistent with its plain words. Dkt. # 77 at 19-20. However, the cases cited by plaintiffs in

13   support of this proposition are quite distinct from the factual situation here. *Id.* In the cases cited

14   by plaintiffs, the plan administrator: (1) analyzed the "medical necessity" of care under separate

15   guidelines that "enunciate[d] a different definition of 'medically necessary' than the one

16   contained in the Plan," *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of*

17   *Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995); and (2) refused to evaluate a member's claim because

18   she failed to provide "objective medical evidence," despite the fact that the Plan "contained no

19   specific requirements for objective medical evidence," *Maronde v. Sumco USA Grp. Long-Term*

20   *Disability Plan*, 322 F. Supp. 2d 1132, 1139 (D. Or. 2004).

21   Here, the Summary Plan Description states that "Premera Blue Cross has developed or

22   adopted guidelines and medical policies that outline clinical criteria used to make medical

23   necessity determinations." *Id.* at 46. In this case, the relevant adopted medical policy was the

24   InterQual Criteria. "While InterQual's criteria are certainly more *specific* than the plan," the

25   Court does not find them to be more stringent. *N.F.*, 2021 WL 4804594, at *4 (emphasis in

26   original); *see also Todd R. v. Premera Blue Cross Blue Shield of Alaska*, No. C17-1041JLR,

27   2021 WL 2911121, *14 (W.D. Wash. July 12, 2021).

28

ORDER ON SUMMARY JUDGMENT - 21

1    Plaintiffs point to the report of their expert, Dr. Kraus, which critiques the InterQual

2    Criteria and opines that it does not accurately represent the standard of care. *See* Dkt. # 29-4 at

3    19-22. However, the relevant question here isn't whether every physician agrees with the

4    InterQual Criteria, but whether Premera's adoption of the Criteria evinces that it was operating

5    under a conflict of interest when it reviewed S.L.'s claim. Given the widespread acceptance of

6    the InterQual Criteria, and the fact that an independent physician reviewer also concluded that

7    S.L.'s stay at Catalyst was not medically necessary using the standards advocated by Dr. Kraus,

8    AR at 1556-57 (IRO decision using CALOCUS[11] to determine necessary level of care); Dkt.

9    # 29-4 at 16 (Dr. Kraus explaining that "CALOCUS [is] designed to reflect the generally

10   accepted standards for evaluating levels of care and service care/intensity across the care

11   continuum"), the Court finds that plaintiffs have failed to raise a triable issue of fact as to

12   whether the adoption of the InterQual Criteria demonstrates that Premera was operating under a

13   conflict of interest.

14   Plaintiffs also argue that the adoption of the InterQual Criteria violates the Parity Act,

15   and that this somehow demonstrates a conflict of interest.[12] Dkt. # 77 at 17. The Court is not

16   convinced. Indeed, the one case cited by plaintiffs in support of this argument, *M. S. v. Premera*

17   *Blue Cross*, 553 F. Supp. 3d 1000 (D. Utah 2021), demonstrates the weakness of their argument.

18   In *M. S.*, the plaintiff brought both a denial of benefits claim and Parity Act claims against

19   defendants after Premera denied coverage for the minor member's stay at a residential treatment

20

21

22   [11] "CALOCUS" is the Child and Adolescent Level of Care Utilization System. AR at 1556.
     Plaintiffs' expert, Dr. Kraus, explained that:

23       Numerous experts in the field of child and adolescent psychiatry spent years
24       developing, refining and validating the CASII and its precursor, The Child and
         Adolescent Level of Care Utilization System (or CALOCUS). Both CASII and
25       CALOCUS are designed to reflect the generally accepted standards for evaluating
26       levels of care and service care/intensity across the care continuum.

     Dkt. # 29-4 at 15-16 (footnotes omitted).

27   [12] As discussed above, plaintiffs do not bring a Parity Act claim, *see* Dkt. # 87 at 8, but instead
28   argue that Premera's alleged violation of the Parity Act should be interpreted as evidence of its conflict
     of interest and an abuse of discretion.

1 center, finding that the stay was not medically necessary. 553 F. Supp. 3d at 1007-17. The court

2 granted summary judgment to defendants on the denial of benefits claim, finding that Premera's

3 conclusion that the stay was not medically necessary – which relied on an analysis under the

4 InterQual Criteria – was not an abuse of discretion. *Id.* at 1026-27. However, the court found

5 that plaintiff had shown a violation of the Parity Act; specifically that "the process used to apply

6 the medical necessity treatment limitation – the InterQual Criteria – is more stringent as applied

7 to mental health benefits than it is as applied to a medical/surgical benefit in the same

8 classification." *Id.* at 1028-33.

9         Plaintiffs have failed to demonstrate that the alleged Parity Act violation, if proved,

10 would establish that Premera is operating under a conflict of interest. Accordingly, the Court

11 declines to consider Dr. Kraus's report for this purpose. *See, e.g.*, *Neathery v. Chevron Texaco*

12 *Corp. Grp. Acc. Policy No. OK826458*, No. C05-1883JM, 2007 WL 1110904, at *4 (S.D. Cal.

13 Apr. 9, 2007) (concluding that evidence undermining the credibility of the doctor who prepared

14 the report on which the denial of benefits relied was not sufficiently tied to a potential "conflict

15 of interest" because "[a]ny evidence of Dr. Lewis's alleged professional incompetency is

16 irrelevant to" the determination of "the extent to which the defendant is operating under a

17 conflict of interest"). The Court finds that, viewing the evidence in the light most favorable to

18 the plaintiffs, plaintiffs have failed to raise a genuine issue of material fact as to whether

19 Premera's adoption or implementation of the InterQual Criteria demonstrates the existence of a

20 conflict of interest.

21         **V.      PROCEDURAL IRREGULARITIES**

22         Plaintiffs also argue that a number of procedural irregularities "influenced decision-

23 making throughout the claim and appeal review process." Dkt. # 77 at 15. Specifically, plaintiffs

24 argue: (1) in the initial denial, Premera provided only 90 minutes for Catalyst to produce up to

25 date medical records; (2) in the Level I appeal, Premera's independent physician reviewer failed

26 to correctly apply the InterQual Criteria to plaintiffs' claim, basing his decision on an

27 "assessment of S.L.'s condition on a single day"; (3) in the Level II appeal, Premera failed to

28 engage a mental health expert and relied on a panel member "who was generally disinclined to

approve residential mental health treatment"; (4) at all levels of review, Premera "ignored the opinions of S.L.'s treating providers"; and (5) Premera failed to identify specific plan language as the basis for its denials. Dkt. # 77 at 15. The Court addresses each of these arguments in turn.

### A. Initial Denial

Plaintiffs argue that Premera's conflict of interest is illustrated by its "rush to judgment in its initial denial of S.L.'s claim." Dkt. # 77 at 18.

On May 13, 2016, plaintiffs submitted a pre-authorization coverage request for S.L.'s treatment at Catalyst. AR at 614. The request included records from S.L.'s admission to Evoke but did not contain any medical records related to S.L.'s admission to Catalyst. *Id.* at 1858. On May 16, 2016 at 9:39 am, Premera reached out to Catalyst, leaving a voicemail to explain that current medical records were required to justify the current admission request. *Id.* at 2040. At 10:30 am that day, representatives from both Premera and Catalyst spoke – the representative from Catalyst stated that they would try to procure records from Evoke to provide to Premera. *Id.* at 2041. The Premera representative noted that if no records were provided by 12:00 pm, the case would be reviewed "for a possible denial." *Id.* No additional records were provided by Catalyst that day. *Id.* at 2042. Subsequently, Premera denied the request, stating:

> The information that the residential treatment facility gave to your health plan is from 3 months ago and farther back. Without information about your recent and current condition, your health plan does not have enough information to be able to tell if residential treatment to treat a mental health condition is medically necessary. Therefore, mental health residential treatment is denied as not medically necessary.

*Id.* at 1858. Catalyst later submitted additional documentation from S.L.'s stay. *Id.* at 2048. Lisa Dickman, S.L.'s treatment provider at Catalyst, and Premera's Medical Director, Dr. Robert Small, had a phone call to discuss the denial. *Id.* Dr. Small's notes from the call reflect that he "reviewed the additional documentation" provided by Catalyst, but found "there was no documentation of symptoms or symptom severity meeting our medical necessity criteria for [a residential treatment center]." *Id.* He further reported that the Catalyst representative "did not disagree, noting that [S.L.] was there to work on various issues, not because of any current symptom severity." *Id.* Accordingly, Dr. Small concluded that "the denial is upheld." *Id.*

ORDER ON SUMMARY JUDGMENT - 24

1    Plaintiffs argue that Premera breached its fiduciary duties under ERISA by providing
2  Catalyst with only 90 minutes to obtain and deliver S.L.'s records from Evoke, as well as failing
3  to contact Evoke directly or reach out to S.L.'s father.[13] Dkt. # 87 at 10; *see also* Dkt. # 85 at 13
4  (citing 29 U.S.C. § 1104 (a)(1) (explaining that the "prudent man standard of care" applies to
5  ERISA fiduciaries)). Defendants argue that they provided plaintiffs with an opportunity to
6  submit additional records and have a Catalyst representative speak with Dr. Small, thus "there
7  was no procedural impropriety," and Premera complied with ERISA's "meaningful-dialogue
8  requirement." Dkt. # 84 at 13-14.

9    The case plaintiffs rely upon for their contention that Premera violated its fiduciary duty,
10 *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997), specifically discusses the
11 failure to request additional information in the context of ERISA's "meaningful dialogue"
12 requirement. *Booton*, 110 F.3d at 1463. The "meaningful dialogue" requirement compels plan
13 administrators to "provide a claimant with a written or electronic notification of any adverse
14 benefit determination." 29 C.F.R. § 2560.503-1(g). The notification must, among other things,
15 provide "[a] description of any additional material or information necessary for the claimant to
16 perfect the claim and an explanation of why such material or information is necessary." *Id.*
17 § 2560.503-1(g)(iii).

18    In *Booton*, the claimant had been kicked in the teeth by a horse, causing severe damage to
19 four of her front teeth. 110 F.3d at 1462. To reset the teeth, her dentists splinted the injured front
20 teeth to her rear teeth for support and performed a number of treatments on her rear teeth in
21 order to prepare them for splinting. *Id.* However, when she submitted a claim for the work done
22 to prepare her back teeth, her claim was denied. *Id.* The plan administrator's rationale was that
23 the plan covered only dental work "required on account of accidental injury to natural teeth,"
24 and here "[t]he back teeth had not been injured." *Id.* The plan administrator continued to issue
25 denials despite claimant's attempts to submit additional evidence explaining the "connection

26

27    [13] Plaintiffs also repeatedly reference the fact that this all took place 3 days after Premera
28 received the claim. However, it appears that the regulations provide plan administrators with 15 days
   after the receipt of a pre-service claim to notify the claimant of the benefit determination. 29 C.F.R. §
   2560.503-1(f)(iii)(A).

1  between the injury and the work performed on her back teeth." *Id.* Even worse, the plan

2  administrator's consulting dentist had advised the plan that "more information (such as pre-

3  accident X-rays) might help Booton substantiate her claim," and identified certain records he

4  would request "if questioned." *Id.* at 1462-63. However, "instead of requesting these records,

5  [the plan administrator] sent out a stream of cookie-cutter denial letters." *Id.* at 1462.

6        Here, in contrast, Premera indicated what information was "necessary for claimant to

7  perfect the claim" in its denial. 29 C.F.R. § 2560.503-1(g)(iii). Furthermore, there is evidence

8  that plaintiffs had an opportunity to submit additional records in response to Premera's denial,

9  and that Premera considered those records when making its decision to uphold the initial denial.

10  *See* AR at 2048. Thus, to the extent Premera's actions constituted a procedural irregularity, the

11  Court does not assign it significant weight in tempering the abuse of discretion standard. *See*

12  *Krysten C. v. Blue Shield of Cal.*, 721 F. App'x 645, 647 (9th Cir. 2018) (explaining that

13  although a plan administrator's decision on a claimant's appeal of denial of benefits "in less than

14  two hours without consulting [the residential treatment center at which claimant resided]

15  constituted a procedural irregularity," the "error was made harmless when [the plan

16  administrator] allowed [claimant] and [residential treatment center] to submit records and re-

17  considered her appeal").

18                    **B.  Level I Appeal**

19        Plaintiffs argue that Premera erred in its Level I appeal by arbitrarily focusing on S.L.'s

20  condition on a single day in its review. Dkt. # 77 at 23. Specifically, plaintiffs contend that Dr.

21  William Holmes, the Level I appeal reviewer, only analyzed S.L.'s condition on a single day –

22  May 17, 2016, the day of his admission to Catalyst. *Id.* According to plaintiffs, Dr. Holmes's

23  review was "not only erroneous medically, but ignored that even the InterQual Criteria . . .

24  provides look-back periods for functionality." *Id.*

25        As an initial matter, the Court agrees that Dr. Holmes's review was focused on whether

26  S.L.'s stay at Catalyst was medically necessary at the time of his admission on May 17, 2016.

27  However, the Court is not convinced that Dr. Holmes only considered S.L.'s symptoms on that

28  single date. As plaintiffs point out, the relevant InterQual Criteria looks at symptoms occurring

"within [the] last week." AR at 2704. Dr. Holmes cited the relevant InterQual Criteria as a "record" he consulted as part of his review. AR at 624. While Dr. Holmes frequently references the May 17 date in his decision, plaintiffs have failed to identify any manifestation of the relevant symptoms under the InterQual Criteria in the week prior to S.L.'s admission to Catalyst that Dr. Holmes failed to address. *See* Dkt. # 87 at 12 (citing events occurring after S.L.'s admission to Catalyst). Thus, despite the language used by Dr. Holmes, *see, e.g.*, AR at 626 (stating "[o]n 5/17/16 none of these areas of concern were present"), the Court finds that – considering Dr. Holmes's assurances that he reviewed the InterQual Criteria and the relevant medical records – a more reasonable interpretation of the report is that at Dr. Holmes did consider the "look back" period mandated by the InterQual Criteria, but found that as of the time of his admittance to Catalyst, S.L.'s stay was not "medically necessary" under the terms of the Plan.

However, a corollary of this finding is that Dr. Holmes's report appears to be focused solely on whether residential treatment was medically necessary for S.L. at the time of his admittance to Catalyst. Plaintiffs argue that this failure to consider whether Catalyst records from the time period after S.L.'s admission supported a finding of medical necessity was unreasonable. Dkt. # 87 at 11-12. The Court agrees that Dr. Holmes's failure to address whether, at any point in S.L.'s stay at Catalyst, a residential treatment center would be considered medically necessary under the plan constituted a procedural irregularity. Accordingly, it will weigh this irregularity in applying the abuse of discretion standard.

### C.  Level II Appeal

Plaintiffs argue that the Level II appeal was impacted by Premera's failure to consult with a mental health specialist and the presence of a biased review panelist. The Court addresses each of these arguments in turn.

#### i.  Mental Health Specialist

Plaintiffs argue that Premera's three-person Level II appeal review panel violated ERISA's "full and fair review" requirement, under which Department of Labor regulations require Premera to "consult with a health care professional who has appropriate training and

1   experience in the field of medicine involved in the medical judgment." Dkt. # 77 at 25 (citing 29

2   C.F.R. § 2560.503-1(h)(3)(iii)). Defendants do not dispute the fact that no mental health

3   specialist was a panelist for plaintiffs' Level II appeal. Dkt. # 84 at 15 (explaining that the

4   "Level II panel consisted of a physician Medical Director board-certified in family medicine, a

5   National Accounts Customer Service Manager, and an Operations Manager"). However,

6   defendants argue that it complied with the regulation by "relying on the opinion of an

7   independent child and adolescent psychiatrist [Dr. Holmes], considering his report in the Level I

8   Appeal and again in the Level II Appeal." *Id.*

9          In the cases that plaintiffs rely on for their contention that Premera was required to have a

10  mental health specialist on its Level II appeal panel, the courts found an abuse of discretion

11  "where, among other reasons, none of the medical personnel who reviewed the employee's

12  claim was an expert in the relevant field." *Wessman v. Provident Life & Acc. Ins. Co.*, 606 F.

13  Supp. 2d 1098 (C.D. Cal. 2009) (citing *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118,

14  1122-23 (9th Cir. 1998) and *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir.

15  1990)); *see also Yox*, 2013 WL 6887530, at *7 (finding violation where plan administrator relied

16  on the opinions of an internist, family practitioner, and anesthesiologist where plaintiff's sought

17  coverage for dental reconstruction); *Kupker v. Aetna Life Ins. Co.*, No. C04-106JCC, 2005 WL

18  8172245, at *9 (W.D. Wash. Apr. 27, 2005) (finding violation where plan administrator "failed

19  to consult with a doctor experienced in neurology before concluding that Plaintiff's headaches

20  do not preclude him from performing his own or any other occupation"). Additionally, "ERISA

21  does not mandate new decision-makers for a review of an appeal." *Krysten C.*, 721 F. App'x at

22  647 (citing 29 C.F.R. § 2560.503-1(h)(3)(ii), (v)).

23         Here, plaintiffs' claim was evaluated by a board-certified, independent child and

24  adolescent psychiatrist, and this evaluation was relied upon by the Level II appeal panel. *See*

25  *Wessman*, 606 F. Supp. 2d at 1101-05, 1108-09 (finding no violation where claimant's

26  orthopedic claim was first reviewed by an orthopedic surgeon and later upheld by a radiologist

27  and eventually a second orthopedic surgeon on independent review). The Court finds that

28

1  Premera's failure to include a mental health specialist on the panel for plaintiffs' Level II appeal
2  did not, under the circumstances, constitute a violation of ERISA's regulations.

3                          **ii.  Biased Panelist**

4          Plaintiffs also argue that the Level II appeal was flawed because one of the non-medical
5  panelists – Steve Woods – was "generally disinclined to approve residential mental health
6  treatment." Dkt. # 77 at 15. Specifically, plaintiffs take issue with Mr. Woods's statement that,
7  "[t]he problem I have with RTC's (*and why I don't think they're medically necessary*) is that a
8  majority of their curriculum is spent doing things which on the surface don't appear to be
9  dealing with [mental health] issues." AR at 2169. Mr. Woods went on to state that, in his
10 opinion, Catalyst was "basically a boarding school with some therapy sprinkled on top." *Id.* The
11 Court agrees with plaintiffs that these statements tend to show a disinclination to find residential
12 treatment centers like Catalyst "medically necessary," even though the Plan language provides
13 for mental health residential treatment center coverage. AR at 836. However, the Court notes
14 that any bias Mr. Woods may have brought to the review is somewhat tempered by the fact that
15 he was one of several individuals tasked with reviewing plaintiffs' claim.[14]

16         Furthermore, while Mr. Woods's recommendation to uphold the denial appears to have
17 rested on the "Services" component of the InterQual Criteria, *see* AR at 2165, other panelists
18 appear to have based their denial on different aspects of the InterQual Criteria. Specifically, Dr.
19 Shawn West, a physician board-certified in family medicine, stated that "the request did not
20 appear to meet InterQual Criteria for medical necessity in terms of symptoms at admission.
21 Specifically, criteria was not met for severe functional imparement [sic]." AR at 2172. Dr.

22

23 _____
24 [14] To the extent that plaintiffs take issue with Mr. Woods's description of S.L.'s therapy schedule
   at Catalyst, *see* Dkt. # 87 at 13-15 (arguing that "Mr. Woods' assumptions about the intensity of
25 treatment were flat wrong"), the Court notes that Mr. Woods first cited information from the "appeal
   documents," and then corroborated that schedule with information from Catalyst's website, AR at 2169.
26 Plaintiffs do not identify a significant discrepancy between Mr. Woods's reading of the appeal
   documents (finding that S.L. was getting "one documented session per week and one group session per
27 day," AR at 2169) and the information provided from Catalyst (stating that S.L. is engaged in "weekly
   family and daily group therapies" and "is now down to only one or two individual sessions per week,"
28 AR at 320).

ORDER ON SUMMARY JUDGMENT - 29

1  West's rationale was adopted by Premera in its denial letter. AR at 2174 ("Specifically, criteria
2  were not met for severe functional impairment."). As Mr. Woods's rationale was not adopted by
3  Premera in its denial, this lessens the weight the Court assigns to Mr. Woods's potential bias.
4  *Stephan*, 697 F.3d at 929 (explaining that the "weight" of a conflict of interest "depends upon
5  the likelihood that the conflict impacted the administrator's decisionmaking"). However, the
6  Court will weigh Mr. Woods's apparent disinclination to find residential treatment centers
7  "medically necessary" in its abuse of discretion review.

8  **D.  Ignored History & Providers' Opinions**

9      Plaintiffs also allege that Premera "abused its discretion by ignoring the opinions of
10  S.L.'s treating mental health providers." Dkt. # 77 at 27.[15] However, under ERISA, "plan
11  administrators are not obliged to accord special deference to the opinions of treating
12  physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). "This is
13  especially true where the physician's records do not adequately support a specific diagnosis."
14  *Hoffmann v. Life Ins. Co. of N. Am.*, No. C13-2011JGB, 2014 WL 7525482, at *10 (C.D. Cal.
15  Dec. 29, 2014), *aff'd*, 669 F. App'x 399 (9th Cir. 2016) (citing *Muniz v. Amec Const. Mgmt.
16  Inc.*, 623 F.3d 1290, 1297 (9th Cir. 2010)). While "ERISA and the Secretary of Labor's
17  regulations under the Act require 'full and fair' assessment of claims and clear communication
18  to the claimant of the 'specific reasons' for benefit denials . . . these measures do not command
19  plan administrators to credit the opinions of treating physicians over other evidence relevant to
20  the claimant's medical condition." *Black & Decker*, 538 U.S. at 825. As the Supreme Court has
21  explained, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable
22  evidence, including the opinions of a treating physician," however, "courts have no warrant to
23  require administrators automatically to accord special weight to the opinions of a claimant's
24
25

26      [15] Plaintiffs argue that defendants "never genuinely considered – much less addressed – the
27  consistent opinions of S.L.'s treating providers and Dr. Kraus." Dkt. # 77 at 16. However, the Court
notes that Dr. Kraus's report is dated September 4, 2019. Dkt. # 29-4 at 1. This means it was created
28  long after the IRO decision was issued on July 19, 2017. AR at 1551. Thus, the Court does not fault
Premera for failing to consider Dr. Kraus's report.

physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.

Here, plaintiffs point to three letters written by treatment providers. Specifically: (1) a letter from Shailane Linrud, a social worker at Northwest Behavioral Healthcare Services; (2) a Discharge Summary from Dr. J. Huffine, S.L.'s treating psychologist at Evoke; and (3) a letter from Lisa Dickman, a social worker and S.L.'s therapist at Catalyst. Dkt. # 77 at 27. Defendants argue that Premera received and considered these letters,[16] but that it and its independent physician consultants did not agree with the providers' conclusions that residential treatment care was medically necessary for S.L. Dkt. # 84 at 19-20. Defendants also note that (1) none of the documents were authored by psychiatrists and (2) the documents are not "medical records contemporaneous with the treatment S.L. received." *Id.* Furthermore, defendants argue – and the Court agrees – that the letter from Linrud was written "over three months before S.L. enrolled at Catalyst" and thus has limited weight. *Id.* at 20. As to Huffine and Dickman's assessments, Premera notes that neither address why S.L. needed to be confined in residential treatment, explain why his conditions could not be addressed in a less intensive setting, or apply any criteria to assess the medical necessity of residential treatment.[17] *Id.* Plaintiffs have failed to demonstrate that Premera did not consider these letters or "arbitrarily refused" to credit them in reviewing S.L.'s claim.

Additionally, plaintiffs complain that "[n]either Premera nor its consultants explained why S.L.'s providers' opinions were not credible." Dkt. # 77 at 28. However, as discussed above, in the ERISA context plan administrators do not face a "discrete burden of explanation

---

[16] Defendants also note that Premera received and reviewed a letter from Adam Poll, MS, LMFT at Catalyst, dated July 5, 2017. Dkt. # 84 at 19.

[17] Critically, Premera has never argued that S.L. did not require *any* treatment. Premera instead argues that "[i]n this case, a less intensive level of treatment in S.L.'s own community was medically necessary, and Premera would have provided coverage for this treatment." Dkt. # 84 at 18; *see also* AR at 2165 (Level II reviewer commenting that "[t]here's no doubt in my mind that this member has some mental health & possibly chemical dependency issues that he needs help with"); *id.* at 1556 (IRO review finding S.L.'s CALOCUS score "correlates with intensive outpatient services").

1    when they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*,

2    538 U.S. at 834. Here, Premera based its determination on a lack of symptoms meeting the

3    InterQual Criteria. Furthermore, Premera notes that "[t]hese letters are not medical records

4    contemporaneous with the treatment S.L. received, but advocacy pieces prepared specifically to

5    obtain coverage during the appeal." Dkt. # 84 at 20. The Supreme Court has noted that treatment

6    providers may, in close cases, be biased towards advocating for coverage. *Nord*, 538 U.S. at 832

7    (noting "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not

8    disabled,' so a treating physician, in a close case, may favor a finding of 'disabled'").

9         The Court concludes plaintiffs have failed to show that Premera abused its discretion by

10   arbitrarily ignoring the opinions of S.L.'s treatment providers.

11                          **E.  Failed to Identify Plan Language**

12        Plaintiffs also argue that while Premera "stated that its denial was 'based on the plan

13   language and InterQual Criteria' [it] failed to identify any plan language as the basis for its

14   denial." Dkt. # 77 at 24 (quoting AR at 588). Plaintiffs contend that this failure was in violation

15   of 29 C.F.R. § 2560.503-1(j)(2). *Id.* at n.4.

16        ERISA prescribes requirements for the notice that insurers must give claimants when

17   denying their claims. 29 U.S.C. § 1133. Department of Labor regulations elaborate on the

18   information that insurance companies must provide, including that denials must provide

19   "[s]pecific reference to pertinent plan provisions on which the denial is based." 29 C.F.R.

20   § 2560.503-1(j)(2).

21        Here, the denial was based on Premera's "medical necessity" determination. *See* AR at

22   558-59 (initial denial); *id.* at 1185-89 (Level I appeal); *id.* at 1189-91 (Level II appeal). Plaintiffs

23   fail to explain why the "medical necessity" language of the Plan is not sufficiently specific

24   under ERISA. Additionally, in evaluating this argument, the Court must take note that, under

25   Ninth Circuit law, only substantial compliance with ERISA's notice requirements is required.

26   *See Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1032 (9th Cir. 2006) (noting that "substantial

27   compliance with these requirements [i.e., § 1133 and its implementing regulation] is sufficient").

28

ORDER ON SUMMARY JUDGMENT - 32

1    Here, plaintiffs have not demonstrated that Premera did, in fact, violate the notice requirements

2    and the Court finds Premera's denial at least substantially complied with ERISA's requirements.

3                    **VI.    PREMERA'S BENEFITS DETERMINATION**

4            Having addressed plaintiffs' arguments regarding Premera's potential conflicts of interest

5    and procedural irregularities in the claims process, the Court now turns to the key question: the

6    reasonableness of Premera's determination that S.L.'s stay at Catalyst was medically necessary

7    under the terms of the Plan. The Court reviews this determination under the abuse of discretion

8    standard. However, as discussed above, the Court agrees with plaintiffs that there were

9    procedural irregularities in the claims process, the most significant of which is the focus on the

10   pre-admission period in Dr. Holmes's Level I appeal report. By focusing on S.L.'s pre-

11   admission symptoms, Dr. Holmes apparently failed to consider whether S.L.'s symptoms while

12   at Catalyst rendered care at a residential treatment center medically necessary. Furthermore, as

13   plaintiffs note, this limitation also impacted the Level II appeal process, as the review panel

14   relied upon Dr. Holmes's report in upholding the denial. As discussed above, the Court gives

15   this procedural irregularity, and the other procedural irregularities identified above, appropriate

16   weight in calibrating the abuse of discretion standard.

17           However, even under a tempered abuse of discretion standard, the Court finds that

18   Premera's decision was reasonable. Plaintiffs have not clearly demonstrated that S.L. exhibited

19   symptoms meeting the InterQual Criteria requirements for residential treatment center care

20   either in the week prior to his admission to Catalyst or in the subsequent weeks. Additionally,

21   the Plan language plainly indicates that, for S.L. to be eligible for coverage at a residential

22   treatment center, he must be receiving "psychiatric evaluation at least one time per week." AR at

23   2704. There is no dispute that S.L. received only one psychiatric evaluation at Catalyst from J.

24   Blake Petrick, a psychiatric nurse practitioner. *See id.* at 335-39. Furthermore, the IRO review –

25   which evaluated S.L.'s condition using the CALOCUS tool rather than the InterQual Criteria –

26   affirmed Premera's conclusion that residential treatment center care was not medically

27   necessary, concluding that S.L.'s CALOCUS score correlated with "intensive outpatient

28   services." AR at 1556.

ORDER ON SUMMARY JUDGMENT - 33

While the Court is sympathetic to S.L.'s difficult situation and appreciates the dedication and advocacy his parents demonstrated in getting him the care they felt he needed, it cannot say that Premera's denial of benefits in this instance constituted an abuse of discretion.

## VII.   CONCLUSION

For all the foregoing reasons, it is HEREBY ORDERED that:

1.  Defendants' motion for summary judgment (Dkt. # 75) is GRANTED. Plaintiffs' motion for summary judgment (Dkt. # 77) is DENIED. The Clerk of Court is directed to enter judgment against plaintiffs and in favor of defendants.

2.  Plaintiffs' motion to seal (Dkt. # 80) is GRANTED.

3.  Defendants' motion to seal (Dkt. # 89) is GRANTED.

DATED this 31st day of May, 2023.

Robert S. Lasnik
United States District Judge

ORDER ON SUMMARY JUDGMENT - 34